**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 28, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

In re:

RUDY LESLIE PAUL;
CAROL CHRISTENSEN PAUL,                         No. 07-1395

        Debtors.

RUDY LESLIE PAUL;
CAROL CHRISTENSEN PAUL,

        Plaintiffs-Appellees,

v.

TAMMY IGLEHART,

        Defendant-Appellant.

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. Nos. 05-cv-02047-WYD & 05-cv-02266-WYD)**

Submitted on the briefs:[*]

Robert T. Lego, Lego Law Firm, Englewood, Colorado, for Appellant.

_____

[*]    After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

David S. Oppenheim, David S. Oppenheim & Associates, P.C., Centennial, Colorado, for Appellees.

Before **McCONNELL** and **ANDERSON**, Circuit Judges, and **BRORBY**, Senior Circuit Judge.

**ANDERSON**, Circuit Judge.

This case concerns the protective scope of the "discharge injunction" created by 11 U.S.C. § 524(a)(2), which bars efforts to collect personal debts from debtors after they have been discharged in bankruptcy.[1] In an adversary proceeding brought by former debtors Rudy and Carol Paul, the bankruptcy court held that Tammy Iglehart violated the discharge injunction when, in state court litigation against a corporate business she jointly owned with Rudy Paul, she (1) sought discovery from the Pauls regarding the assets and operation of the business and obtained sanctions when they did not comply, and (2) supplemented her pleadings to allege claims for post-petition wrongdoing by Rudy Paul in connection with the wind-up of the business. Ms. Iglehart contends that she did nothing to violate the discharge injunction, since (1) the discovery was for the entirely legitimate purpose of obtaining information in support of her recovery

---

[1] The relevant text of the statute reads: "A discharge in a case under [the Bankruptcy Code] – operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any [discharged] debt as a personal liability of the debtor."

against the corporation (which never filed bankruptcy itself and was not part of the Pauls' bankruptcy estate[2]), and expressly excluded inquiry into any discharged claims against the Pauls, and (2) the claims she later added against Rudy Paul were unaffected by the discharge injunction, which does not reach non-discharged claims arising post-petition. We conclude that neither the bankruptcy court's findings, nor the facts of record on which they are based, demonstrate that Ms. Iglehart's facially permissible actions violated the discharge injunction. We therefore reverse.

## FACTUAL BACKGROUND

In 1997, Ms. Iglehart filed suit in state (Colorado) court asserting several claims arising out of her connection with Peak Sports & Spine Physical Therapy, P.C. (Peak Sports), of which she had been an owner, officer, and employee. Some of these claims were asserted against Peak Sports itself, while others were asserted against individuals, including Rudy Paul. Sometime later, Ms. Iglehart added a claim against Carol Paul for defamation. In May 2001, the Pauls jointly filed for bankruptcy under Chapter 7, staying proceedings against them in the state suit, which had stalled for various reasons. In September 2001, Ms. Iglehart obtained an entry of default against Peak Sports in the state suit, with damages left to be determined. A month later, the Pauls' bankruptcy proceeding was

---

[2] Indeed, the Pauls' bankruptcy trustee even abandoned their stock interest in the corporation. App. Vol. 2 at 178-79.

favorably terminated with an order discharging them from their pre-petition debts, which included the claims Ms. Iglehart had asserted against them in state court. Rudy Paul continued to oversee the wind-up of Peak Sports, which was dissolved the next year.

In 2003, Ms. Iglehart sent notices of Colorado depositions to the Pauls (who had moved to Wisconsin) in the state suit, which proceeded in substance against Peak Sports with the Pauls left as nominal defendants.[3] She contended that the Pauls still had to comply with discovery obligations, including traveling to Colorado for deposition. At the same time, however, she acknowledged, with a specific reference to § 524(a)(2) on the face of the deposition notices, that her discovery efforts could not involve the Pauls' own discharged pre-petition liabilities. When the Pauls failed to appear, she moved to enforce their discovery obligations through sanctions. The state court imposed penalties of $2,500 on each of the Pauls and another on Rudy Paul as president of Peak Sports, all of which would be voided if they appeared for a make-up deposition. The court also imposed a similar penalty on Rudy Paul for failing to respond to requests for documents relating to Peak Sports.

---

[3]     The Pauls had not sought a formal dismissal to remove themselves from the case. Indeed, they subsequently relied on their continued presence in the case to afford them standing to move for the entry of a default judgment against Peak Sports.

The Pauls sought reconsideration of the sanctions, arguing that their personal immunity from liability on the (pre-petition) claims asserted in the litigation, by virtue of the discharge injunction, nullified their formal status as parties for purposes of discovery obligations. The state court ultimately agreed, holding that discovery could be obtained from them only in a manner appropriate for non-resident non-parties. As Ms. Iglehart had not proceeded in this manner, the court vacated the sanctions it had previously imposed. Nothing in the record, however, suggests that the state court found any impropriety in the substance of the discovery Ms. Iglehart sought from the Pauls—which she has consistently maintained, with inherent legitimacy, was directed toward her claims against Peak Sports (and, for a time, other co-defendants), in particular to obtain information about corporate assets that might be traced to satisfy those claims. Indeed, the state court plainly countenanced further efforts for such discovery from the Pauls, limited solely as to the procedure to be followed.

The Pauls also brought this adversary proceeding in the bankruptcy court, alleging that Ms. Iglehart's conduct in the state case violated the discharge injunction. In the meantime, Ms. Iglehart supplemented her state pleadings to add claims against Rudy Paul for post-petition wrongdoing in connection with the wind-up of Peak Sports. Liabilities for post-petition conduct are not discharged,[4]

---

[4] A chapter 7 bankruptcy discharges "all debts that arose before the date of the order for relief." 11 U.S.C. § 727(b). Under 11 U.S.C. § 301, "[t]he filing of
(continued...)

and thus do not implicate the discharge injunction.  Nevertheless, the bankruptcy court inquired into the new claims, as well as Ms. Iglehart's discovery efforts, at a hearing on the Pauls' adversary complaint, and ruled from the bench that the discharge injunction had been violated in both respects.  At the court's request, its lengthy oral ruling was summarized in an order prepared by the Pauls' counsel.  As for prospective relief, the court enjoined "any further pursuit of the [Pauls] in the State Court matter," App. Vol. 1 at 53, including, unqualifiedly, any "further efforts to depose [them] or submit to them requests for production of corporate documents," *id.* Vol. 2 at 355.  As for sanctions, the court conducted additional proceedings and ultimately ordered Ms. Iglehart personally to pay the Pauls over $15,000 in fees and costs.  On reconsideration, the bankruptcy court held to its decision, which the district court later affirmed.  This appeal followed.

## GOVERNING LAW – THREE KEY PRINCIPLES

We turn now to the law governing enforcement of discharge injunctions.  There are three basic principles that together point to the problem raised by this appeal.

---

[4](...continued)
a petition under Chapter 7 constitutes 'an order for relief.'"  *Boeing N. Am., Inc. v. Ybarra (In re Ybarra)*, 424 F.3d 1018, 1022 (9th Cir. 2005); *see* 2 Collier on Bankruptcy ¶ 301.01, at 301-4 (15th ed. rev. 2008).  Thus, "[d]ebts arising after the bankruptcy case has commenced are not discharged."  *In re Rostek*, 899 F.2d 694, 696 (7th Cir. 1990); *see River Place E. Housing Corp. v. Rosenfeld (In re Rosenfeld)*, 23 F.3d 833, 836 (4th Cir. 1994); *Bush v. Taylor*, 912 F.2d 989, 993 (8th Cir. 1990) (en banc).

## A. The Terms of § 524(a)(2) Control

Under 11 U.S.C. § 105(a), bankruptcy courts have the equitable power to enforce and remedy violations of substantive provisions of the Bankruptcy Code, including in particular the discharge injunction in § 524(a)(2). *Walls v. Wells Fargo Bank, N.A.*, 276 F.3d 502, 506-07 (9th Cir. 2002) (discussing *Bessette v. Avco Fin. Servs., Inc.*, 230 F.3d 439, 444 (1st Cir. 2000)); *see Cox v. Zale Del., Inc.*, 239 F.3d 910, 916-17 (7th Cir. 2001); *see also Mountain Am. Credit Union v. Skinner (In re Skinner)*, 917 F.2d 444, 447 (10th Cir. 1990) (same holding as to bankruptcy court powers to sanction violation of automatic stay). But that equitable power cannot be exercised contrary to or in excess of the terms of the substantive Code provision being enforced. 1 Norton Bankruptcy Law & Practice § 13:3 (3d ed. 2008); *see, e.g.*, *Alderete v. Educ. Credit Mgmt. Corp. (In re Alderete)*, 412 F.3d 1200, 1207 (10th Cir. 2005); *Landsing Diversified Props.-II v. First Nat'l Bank & Trust Co. (In re W. Real Estate Fund, Inc.)*, 922 F.2d 592, 601 (10th Cir. 1990), *op. modified on other grounds,* 932 F.2d 898 (10th Cir. 1991). Thus, a bankruptcy court may sanction a party for violating the discharge injunction only if the party *took some action prohibited by § 524(a)(2)*—i.e., an action "to collect, recover or offset any [discharged] debt . . . of the debtor."

This may seem an obvious point when stated in the abstract, yet it can easily be overlooked in the course of a bankruptcy court's practical effort to support a debtor's fresh start following discharge. A host of circumstances can

affect a former debtor's financial comeback. But the concept of "fresh start" is just a general gloss on the purpose of § 524(a); it is not a license for courts to go beyond the particular prohibitions specified in the statute to shield debtors from adverse contingencies. However well-intentioned the effort in trying to facilitate a debtor's fresh start, a bankruptcy court may not enjoin and sanction a creditor with respect to conduct that does not violate § 524(a).

**B. § 524(a)(2) Permits Suits in which Debtors are Nominal Defendants and Debtors may be Required to Comply with Discovery**

Although § 524(a)(2) prohibits actions brought to collect a discharged debt from the debtor, it permits suits—even those brought to collect on debts a debtor has discharged—that formally name the debtor as a defendant but are brought to collect from a third party. *In re W. Real Estate Fund, Inc.*, 922 F.2d at 601 n.7; *accord Houston v. Edgeworth (In re Edgeworth)*, 993 F.2d 51, 54 & n.6 (5th Cir. 1993) (citing cases); *Hendrix v. Page (In re Hendrix)*, 986 F.2d 195, 197 (7th Cir. 1993) (same). And requiring a debtor to bear such collateral burdens of litigation as those relating to discovery (as opposed to the actual defense of the action and potential liability for the judgment), does not run afoul of § 524(a)(2). *Walker v. Wilde (In re Walker)*, 927 F.2d 1138, 1143-44 (10th Cir. 1991); *In re Edgeworth*, 993 F.2d at 54; *Simpson v. Rodgers (In re Rodgers)*, 266 B.R. 834, 837 (Bankr. W.D. Tenn. 2001) (citing cases); *In re Doar*, 234 B.R. 203, 206 (Bankr. N.D. Ga. 1999) (same). As one court succinctly put it: "The Debtor,

whether she has received a discharge or not, is not relieved of the responsibility she has, as do all citizens, to testify at trial and/or participate in discovery as a witness." *In re Doar*, 234 B.R. at 206 ("reject[ing] the Debtor's argument that requiring her to participate in discovery in [collateral] state court litigation will impermissibly interfere with her 'fresh start'"). It is worth adding, since much of the criticism our bankruptcy court leveled at Ms. Iglehart concerned what it saw as the inept and burdensome manner in which she sought discovery in her state suit, that if a creditor pursues discovery against a nominal-defendant debtor in a suit otherwise permitted by § 524(a)(2), the *court hearing that suit* is the appropriate authority to address the manner in which discovery is conducted (as the state proceedings here illustrate). As a general matter, it is both inappropriate and unnecessary for a bankruptcy court to oversee the conduct of litigation in other courts.

### C. Objective-Coercion Principle

This third principle operates as an overarching exception to what we have said so far. Notwithstanding the facial permissibility of a lawsuit or some other action taken by a creditor vis a vis a discharged debtor, a violation of § 524(a)(2) may still be found if the debtor proves "the creditor acted in such a way as to 'coerce' or 'harass' the debtor improperly," i.e., so as to obtain payment of the discharged debt. *Pratt v. Gen. Motors Acceptance Corp. (In re Pratt)*, 462 F.3d 14, 19 (1st Cir. 2006); *see In re Schlichtmann*, 375 B.R. 41, 95-97

(Bankr. D. Mass. 2007) (applying *Pratt* with extensive discussion); *see also In re Jones*, 367 B.R. 564, 570 & n.3 (Bankr. E.D. Va. 2007); 3 Norton Bankruptcy Law & Practice 3d § 58:5, at 58-24 & n.13 (noting that discharge injunction precludes otherwise permissible actions against third parties if "designed to collect the debt from the discharged debtor"). The inquiry is objective; the question is whether the creditor's conduct had the practical, concrete effect of coercing payment of a discharged debt, and bad faith is not required. *In re Pratt*, 462 F.3d at 19; *In re Schlichtmann*, 375 B.R. at 95. By the same token, the presence of some other procedural impropriety or error in connection with the creditor's action will not give rise to a violation of the discharge injunction if the objective effect is not to coerce payment of a discharged debt:

> [T]he discharge prohibits prepetition creditors only from collecting their prepetition debts. It is not [a] lifelong shield against other acts–including . . . assertions of claims, and litigation–by those same creditors, even where these other acts are undertaken wrongfully and in bad faith. *If an act is not in fact one to collect or enforce a prepetition debt, then whatever its faults, it is not a violation of the discharge, even though undertaken by the holder of a discharged debt.*[5]

*In re Schlichtmann*, 375 B.R. at 97 (emphasis added). Accordingly, a debtor may establish that a creditor who has taken an action not overtly prohibited by

---

[5]     Again, if a creditor's conduct in a non-bankruptcy case involves some impropriety or error outside the limited scope of the discharge injunction, the authority to evaluate and, if appropriate, to correct and/or sanction that conduct properly lies with the court hearing that case. The discharge injunction does not make bankruptcy courts overseers of subsequent litigation involving the debtor.

§ 524(a)(2) nevertheless violated the discharge injunction, but to do so the debtor must "prove not merely that [the creditor's] act is not what it appears to be, but that the act in question is one to collect a discharged debt *in personam*." *Id.*

To flesh out this principle we discuss two examples: one case (*Pratt*) in which objective coercion was found, and another (*Schlichtmann*) in which it was not. In *Pratt*, a creditor held a lien on the debtors' car for the purchase loan. The lien remained enforceable *in rem* following discharge of the underlying debt in bankruptcy.[6] State law allowed the creditor to refuse to release the lien (absent payment of the loan), which prevented debtors from junking the worthless car. The creditor also legitimately refused to accept a surrender of the car under bankruptcy law. Neither act violated § 524(a), but the combined effect coerced the debtors into re-assuming the loan debt they had previously discharged: "confronted with the grim prospect of retaining indefinite possession of a worthless vehicle" and incurring "attendant costs of possessing, maintaining, insuring and/or garaging the vehicle," debtors had no choice but to reaffirm the discharged debt so that the creditor would release its lien and thereby enable them to dispose of the car. *In re Pratt*, 462 F.3d at 19-20. In finding a violation of § 524(a), the court did not look for bad faith, but its objective inquiry did take into account the *lack of any reason other than coercion* for the creditor's action:

---

[6] The discharge injunction prohibits efforts to collect a debt "as a *personal liability* of the debtor," 11 U.S.C. § 524(a)(2) (emphasis added), and thus *in rem* rights are not affected. 3 Norton Bankruptcy Law & Practice 3d § 58:4.

-11-

the court noted "there was no reasonable prospect that the automobile would generate future sale proceeds (to which the [creditor's] lien automatically would have attached[)]" and hence "the legitimate *raison d'etre* for the [creditor's continuation of the] lien no longer obtained." *Id.* at 20. The court concluded that "the [creditor's] refusal to release its valueless lien so that the vehicle could be junked–though presumably not made in bad faith–was 'coercive' in its effect, and thus willfully violated the discharge injunction." *Id.*

In *Schlichtmann*, the court likewise reviewed a creditor's post-discharge enforcement of a security interest in a debtor's collateral, there proceeds held in escrow. Unlike the car in *Pratt*, the escrow fund had a substantial value and thus the creditor's facially permissible actions with respect to the collateral were not undercut by the evident lack of any legitimate economic purpose—the creditor's "desire to enforce its rights in the collateral suffice[d] to explain [its] actions." *In re Schlichtmann*, 375 B.R. at 98. Under these circumstances, "one would need very damning evidence indeed to justify a finding . . . that [the creditor] was attempting not merely to enforce its *in rem* rights but also, or instead, to obtain payment from [the debtor] *in personam* on the prepetition debt." *Id.* Such evidence was lacking, and the debtor's claim for § 524 sanctions was denied. Significantly, the court rejected the debtor's allegations of tangential misconduct by the creditor (the creditor had failed to disclose a third party's interest in the matter) as immaterial, illustrating the point that the discharge injunction is limited

-12-

to violations of § 524 and does not give bankruptcy courts a broader authority to intervene on the basis of other objections regarding a creditor's actions toward a discharged debtor: "[A]t worst, [the creditor] was enforcing the *in rem* rights incorrectly. But the rights being enforced were still rights that were outside the scope of the discharge, and [the creditor's] actions would no more have been a violation of the discharge for this impropriety." *Id.*

**ANALYSIS OF CREDITOR'S CONDUCT IN STATE SUIT**

In light of the foregoing legal principles, Ms. Iglehart's continuation of the state litigation against Peak Sports, even with the Pauls nominally remaining in the case as defendants, did not violate § 524(a)(2) and, thus, was not a basis for imposing sanctions against her. Nor was § 524(a)(2) violated merely because she pursued discovery (and sought sanctions for noncompliance) against the Pauls, or because she supplemented her complaint to allege post-petition wrongdoing by Rudy Paul. She could, however, still be held in violation of § 524(a)(2) *if* it were determined, on a factually sufficient record, that the effect of the state litigation was nevertheless to harass and coerce the Pauls into paying discharged debts.

But the bankruptcy court did not make such a determination. Rather, its findings related to matters outside the scope of the § 524(a)(2) inquiry. Indeed, considered within the confines of the proper inquiry, the facts of record would not support a finding of objective coercion justifying the sanction imposed here.

-13-

## A. Bankruptcy Court's Rulings

"Where a district court acts in its capacity as a bankruptcy appellate court, we review the bankruptcy court's decision independently." *Ahammed v. Sec. Investor Prot. Corp. (In re Primeline Sec. Corp.)*, 295 F.3d 1100, 1105 (10th Cir. 2002). Thus, although this matter reaches us after an affirmance by the district court, we directly review the bankruptcy court's legal conclusions de novo and its underlying factual findings for clear error. *Id.* We do not defer to the district court's intermediate appellate analysis, *Bailey v. Big Sky Motors, Ltd. (In re Ogden)*, 314 F.3d 1190, 1195 (10th Cir. 2002), though of course we may look to it to inform our review of the result reached by the bankruptcy court.

### 1. Written Sanction Order Issued after Hearing

In its written order, drafted by the Pauls' counsel, the bankruptcy court found that Ms. Iglehart's pursuit of discovery regarding Peak Sports in the state suit was not undertaken "at the earliest opportunity or even within a reasonable time after the default was entered against Peak Sports"; "was oppressively tardy and unjustified"; and "has been a misplaced effort intended to obtain documents from the corporation [that] has resulted in eviscerating the [Pauls'] fresh start and an opportunity to get on with their lives."[7] App. Vol. 1 at 52 (Bankruptcy Court

---

[7] We note the delay involved here is more understandable when placed in its practical context. The state suit stalled for three years over a dispute about whether Ms. Iglehart had settled her claims before it was filed. Default was not entered against Peak Sports until late 2001, the corporation was dissolved in

(continued...)

-14-

Order filed Aug. 23, 2005). In the same vein, the order criticized Ms. Iglehart for not "tak[ing] advantage of the opportunities in the [Pauls'] bankruptcy to require information from the bankruptcy trustee [or] to examine the books in the trustee's possession," adding that "[t]he [Pauls'] fresh start was impeded and severely hindered mostly because of what has been done postpetition and should have been done much earlier when the books were in the trustee's control." *Id.*

Whether or not this criticism of Ms. Iglehart's conduct is justified, none of it goes to the critical point, i.e., whether her conduct had a coercive effect on the Pauls, pressuring them to pay off any discharged pre-petition claims. The two references to the Pauls' fresh start come closest, but even they just speak in terms of circumstantial interference—an effect any discovery expense or burden, regardless of connection to pre-petition debt, would have, and which the case law discussed above holds permissible—and do not tie Ms. Iglehart's conduct to any specific prohibition in § 524(a)(2). More generally, these objections to the manner in which discovery was conducted in the state suit were for the state court to address. And, in fact, the state court did ultimately limit Ms. Iglehart to non-party discovery procedures and vacate the sanctions it previously imposed on the Pauls for noncompliance with Ms. Iglehart's initial discovery requests.

---

[7](...continued)
2002, and the Pauls' depositions were noticed in April 2003. This time-line is entirely consistent with the facially legitimate purposes for which the discovery was explicitly conducted.

As for the supplemental pleading of post-petition claims against Rudy Paul regarding the wind-up of Peak Sports, the court's order said only that it "finds little evidence of postpetition wrongdoing by the [Pauls], which would give rise to new claims against them." App. Vol. 1 at 52. This analysis is problematic for two reasons. First, the limited question for the bankruptcy court in this contempt proceeding under § 524(a)(2) is whether the claims asserted in the state case fall within the discharge injunction, i.e., allege pre-petition or post-petition conduct. Whether the claims can be proven up is a question for the state court in which they are litigated. In essence, the bankruptcy court made a summary judgment ruling on the merits of matters outside its jurisdiction. We understand what the court was getting at: if the claims are indeed baseless, it might be concluded that the only possible function they serve is to coerce the Pauls into satisfying pre-petition claims Ms. Iglehart can no longer press directly (assuming baseless claims can have such coercive effect). But the merits of the state claims should be determined by the court in which they are asserted. If that court finds them groundless, *then* the bankruptcy court could, based on that disposition, properly do a coercion analysis for purposes of § 524(a)(2) sanctions. Deciding the merits of the claims as part of the § 524(a)(2) analysis, and then enjoining Ms. Iglehart

-16-

from proceeding on them in the state suit, resulted in the bankruptcy court effectively usurping the adjudicative role of the state court.[8]

Second, Ms. Iglehart explained at the sanctions hearing that she needed discovery to make her case on the post-petition claims, but the bankruptcy court never addressed this point—which in a proper summary judgment proceeding in the state case would have implicated the protections of Colorado's version of Rule 56(f).  *See* Colo. R. Civ. P. 56(f).  And if the bankruptcy court discounted this point because of its view that such discovery would violate the discharge injunction, it was, for reasons already discussed, doubly wrong.

## 2.  Bench Ruling at Sanctions Hearing

The bankruptcy court's bench ruling was more lengthy but to the same effect.  These passages give a good account of the essence of its rationale for sanctioning Ms. Iglehart for her discovery efforts in the state suit:[9]

---

[8]     That is not to say a bankruptcy court generally must await the disposition of other litigation before holding that an action taken by a creditor therein violates the discharge injunction.  Often the violation will be evident on its face, such as the assertion of a claim explicitly premised on pre-petition conduct, and enjoining the creditor from proceeding with it does not involve any substantive encroachment on the other court's adjudicative role.  Even when a less direct violation turns on application of the objective-coercion principle, the bankruptcy court's analysis should not entail resolving the *merits* of a claim pending in another court:  the question, rather, is whether the objective *effect* of the claim is to coerce payment of a pre-petition debt.  But when a bankruptcy court seeks to answer that question based on an adjudication of the merits of a creditor's claim, that adjudication should be made by the court hearing the claim.

[9]     As for Ms. Iglehart's supplemental post-petition claims, the court said it

(continued...)

Now, let me address why I feel that continuing this effort and some of the past efforts have or constitute a violation of the injunction. There is an effort to get information [relevant to the unresolved damages issue in the state suit against Peak Sports], which frankly I understand, is an effort to get information by Ms. Iglehart. But that effort to get information has been delayed, complicated, ignored, evaded, or badly handled for about eight years and certainly for the first three or four years and during the bankruptcy.

Moreover, a default was entered [against Peak Sports] in the year 2001; and that could and should have been the trigger to undertake a vigorous, effective search for the information either through the bankruptcy or through the trustee or getting relief from stay to pursue matters in state court or going at Peak directly; but instead, it's dragged on.

And the discovery, especially in the relatively recent past, 2003 to today, has become burdensome, oppressive, costly, too tardy, and unjustified under the circumstances which have come to pass.

I think the fresh start has been impeded and severely hindered, and I think it's mostly because of what's been done postpetition. There were many avenues, many opportunities up until the discharge was entered in this bankruptcy case and shortly after the default was entered but the judgment was not.

. . . .

I cannot understand, and I say this somewhat as a finding but part of my puzzlement, why there was never a vigorous effort to request production of documents from Peak or the Pauls prepetition; why interrogatories were not submitted to them either as officers of Peak or as individuals prepetition; or other requests for admissions;

---

[9](...continued)
saw little or no evidence to support them and "conclude[d] that a claim of postpetition wrongful conduct . . . is not there. It's at least not there in this case arising from [the record made in] this hearing." App. Vol. 2 at 350. In this respect, the oral ruling raises the same problems noted above in connection with the written order.

> or an ability to inspect the books and records prepetition. Why discovery wasn't undertaken while the Pauls were in Colorado, I cannot understand because everything might have been avoided or the misunderstanding that seems to have mushroomed over the years might have been avoided if that had been undertaken.
>
> I'm going to rule in favor of the [Pauls]. I am going to make a specific finding that, as best as I can determine, especially after this ruling and the findings and conclusions on the record, further efforts to depose Mr. and Mrs. Paul or submit to them requests for production of corporate documents would be or constitute a violation of the injunction; an impingement on their fresh start from bankruptcy; an improper litigation strategy to discharged or against discharged debtors.

App. Vol. 2 at 353-55. Nothing in that rationale suffices as a basis for imposing a § 524(a)(2) sanction under the principles we have discussed. There is not a single finding that Ms. Iglehart's discovery efforts were just a means to coerce some payment from the Pauls on discharged claims.

Indeed, the record made at the hearing before the bankruptcy court would not support such a finding. The discovery sought from the Pauls served the plainly legitimate purpose of scrutinizing the conduct of Peak Sports to locate assets of the business to satisfy Ms. Iglehart's significant damages claim against it, and possibly in that regard also uncovering post-petition wrongdoing by Rudy Paul in connection with the corporate wind-up. There was no "*raison d'etre* gap" (as there was in *Pratt*) to fill by inferring a covert agenda implicating § 524(a)(2) prohibitions. And such an agenda was explicitly disavowed by Ms. Iglehart and counsel, not just after the fact at the bankruptcy hearing, but contemporaneously

with the discovery sought in the state suit—on the face of the deposition notices sent to the Pauls. Moreover, Rudy Paul admitted at the hearing that neither Ms. Iglehart nor her counsel ever suggested that they would drop her discovery effort in the state suit in exchange for any monetary consideration from the Pauls.

In sum, Ms. Iglehart pursued discovery from the Pauls relating to claims that did not concern their pre-petition liabilities. As such, her conduct did not violate any prohibition in § 524(a)(2). Clearly it imposed incidental burdens, as discovery does on anyone. But, notwithstanding the "fresh start" gloss on the statute, discharged debtors are not broadly free from any inconvenience and expense that otherwise permissible litigation may impose on them. Their special protection has been delimited by Congress in § 524(a)(2), and a creditor cannot be sanctioned for conduct that does not fall within its terms. Of course, conduct that facially appears permissible may still violate § 524(a)(2) if its objective effect is prohibited, i.e., if it really serves to pressure the debtor to pay a discharged debt. The bankruptcy court made no such finding here; indeed, the record would not have supported such a finding. The thrust of the bankruptcy court's criticism concerned, rather, Ms. Iglehart's practical management of discovery in the state suit, which is not a matter put under bankruptcy court oversight by § 524(a)(2) or any other provision of the Code. Finally, while the state court concluded that Ms. Iglehart erred in the formal process by which she sought the discovery, and for that reason reversed the sanctions it had initially imposed on the Pauls for

noncompliance, that does not translate to a violation of the discharge injunction. Again, "[i]f an act is not in fact one to collect or enforce a prepetition debt, then whatever its faults, it is not a violation of the discharge, even though undertaken by the holder of a discharged debt." *In re Schlichtmann*, 375 B.R. at 97.

### 3. Order Denying Reconsideration

In its denial of Ms. Iglehart's motion for reconsideration, the bankruptcy court did not explicitly return to the merits of the supplemental claims asserted against Rudy Paul in the state suit, but again focused on Ms. Iglehart's discovery efforts. The court began by stating that, when viewed in context, "the discovery tactics employed in the State Court Action were not, as [Ms. Iglehart] suggests, merely either (1) an attempt to obtain discovery as to other remaining Defendants or (2) pursuit [of] some post-petition claim for Mr. Paul's failure to properly wind-down the business of Peak Sports." App. Vol. 1 at 111 (Bankruptcy Court Order filed Oct. 3, 2005). This sounds as if it would lead to a coercion analysis, but what follows is just a short-hand summary of the same criticisms discussed earlier regarding what the court saw as Ms. Iglehart's delayed and ineffectual pursuit of discovery. *See id.* at 112-13. The court then concluded:

> The conduct of [Ms. Iglehart] was not merely to seek discovery to find out information about related entities/other defendants, it was, *whether intentional or not*, a continuation of the litigation in the State Court Action and a grafting of additional or supplemental claims post-petition, that seemingly arose—or sprung—from alleged conduct emanating pre-petition. The reality, here, is that

> [Ms. Iglehart] has pursued "a continuation of an action" and "an act to collect debt" in violation of 11 U.S.C. § 524(a)(2).

*Id.* at 113 (footnote omitted[10]). The general thrust of this passage is simply that Ms. Iglehart continued with her state litigation following the Pauls' discharge. But, as we have seen, the fact that she continued to litigate her case against Peak Sports, even with the Pauls as nominal defendants, did not violate § 524(a)(2), and her pursuit of the supplemental post-petition claims against Rudy Paul was clearly not prohibited.

The only thing implicating the discharge injunction is the notion that the supplemental claims "seemingly arose—or sprung—from alleged conduct emanating pre-petition," if what the court meant by that tentative and oblique statement is that, however the new claims were framed, they were really based on Rudy Paul's pre-petition conduct. Such an understanding, however, would not be an accurate reflection of the bankruptcy court's own findings from the hearing, or of the factual record underlying those findings. Ms. Iglehart supplemented her state pleadings to add allegations clearly limited to Rudy Paul's post-petition

---

[10]    In the footnote, the court noted that Ms. Iglehart had settled with all of the defendants in the state case except Peak Sports (and of course the Pauls) and that this fact undercut her need for discovery to allocate liability on the (pre-petition) claims thereafter pursued against Peak Sports alone. But Ms. Iglehart also sought discovery to scrutinize the wind-up of Peak Sports to trace any assets that might be reachable to satisfy her claims against it, and this purpose was not nullified by settlement with other defendants. And, following the supplementation of her state pleadings to include post-petition claims against Rudy Paul, additional reasons to pursue discovery arose.

-22-

conduct, and the bankruptcy court had not found otherwise. Rather, at the hearing on § 524(a)(2) sanctions the court held only that Ms. Iglehart had not put forth evidentiary support for those claims (again, a determination that should have been left for the state court to make in a proper summary judgment proceeding after allowance for adequate discovery).

**B. District Court's Decision Affirming Bankruptcy Court**

We have been focusing on the bankruptcy court's rulings, as they are the direct object of our review. But we have also considered the district court's decision for what light it might shed on the legal side of the § 524(a)(2) analysis, which the district court reviewed de novo as we do. It does not add or clarify anything relating to Rudy Paul, but it does frame a possible justification for sanctioning Ms. Iglehart for pursuing discovery from Carol Paul:

> The notice of deposition for Mrs. Paul was clearly a violation of the discharge injunction. Mrs. Paul was not involved in the business of Peak [Sports] and, thus, there was no justification in noticing her for a deposition. Further, pursuing discovery based on the defamation claim would clearly be a continuation of a prepetition action against Mrs. Paul.

App. Vol. 1 at 146 (District Court Order filed Aug. 21, 2007).

The problem is that nothing in the bankruptcy court's rulings provides the necessary foundation for this rationale. Nor does the factual record support the critical premise here that Ms. Iglehart lacked a justification for deposing Carol Paul. It is true that she was not, as Rudy Paul was, a shareholder/officer/director

of Peak Sports.  But she was of course married to a shareholder/officer/director, from start-up through wind-up, and Ms. Iglehart testified at the hearing that it was her understanding "that they [Rudy and Carol] were both intimately involved with Peak Sports . . . and the business operations postbankruptcy petition and in relationship to the other defendants in the case, and that there may be information that we could glean in the deposition from them." *Id.* Vol. 2 at 270.  Rudy Paul also testified at the hearing and did not in any way contradict this understanding.

## CONCLUSION

For the reasons explained above, the sanction imposed by the bankruptcy court lacks an adequate basis in law and fact.  The bankruptcy court did not make the findings required for a violation of the discharge injunction, focusing instead on matters outside the scope of the proper inquiry.  Further, the established facts of record would not support the requisite predicate findings in any event.

The bankruptcy court's order sanctioning Ms. Iglehart and enjoining her pursuit of state court litigation is REVERSED.