**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 16, 2012**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

In re: STEVE ZIMMER PAIGE,

    Debtor.

------------------------------------

SEARCH MARKET DIRECT, INC.;
MAGNET MEDIA, INC.,

    Appellants,

v.

GARY E. JUBBER, Trustee of the
Bankruptcy Estate of Stephen Zimmer
Paige; CONSUMERINFO.COM, INC.,

    Appellees.

No. 10-4190

---

In re: STEVE ZIMMER PAIGE,

    Debtor.

------------------------------------

SEARCH MARKET DIRECT, INC.,;
MAGNET MEDIA, INC.,

    Appellants,

v.

GARY E. JUBBER, Trustee;
CONSUMERINFO.COM, INC.;
FABIAN & CLENDENIN,

No. 10-4220

Appellees.

GARY E. JUBBER, Liquidating Trustee
under confirmed Chapter 11 Plan;
CONSUMERINFO.COM, INC.,

    Plaintiffs-Appellees,

v.

SEARCH MARKET DIRECT, INC., a
California corporation,

    Defendant-Appellant.

No. 11-4034

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
AND THE BANKRUPTCY APPELLATE PANEL
(D.C. No. 2:07-CV-00822-DB; BAP No. UT-08-062; D.C. No. 2:09-CV-00988-DB)**

---

Adam S. Affleck, (Michael N. Zundel, James A. Boevers, and Erin M. Stone, with him on the briefs), of Prince, Yeates & Geldzahler, Salt Lake City, Utah, for Appellants Search Market Direct, Inc., Magnet Media, Inc., and Stephen S. May.

Peter W. Billings, (Gary E. Jubber and Douglas J. Payne, with him on the briefs), of Fabian & Clendenin, Salt Lake City, Utah, for Appellee, Gary E. Jubber, Liquidating Trustee.

Robert E. Richards, of SNR Denton US LLP, Chicago, Illinois, (Michael R. Johnson of Ray Quinney & Nebeker, P.C., Salt Lake City, Utah, with him on the briefs), for Appellee, ConsumerInfo.com, Inc.

---

Before **BRISCOE,** Chief Judge, **HOLLOWAY** and **KELLY**, Circuit Judges.

---

**BRISCOE**, Chief Judge.

2

## I. INTRODUCTION

The three cases before us arise from bankruptcy proceedings initiated by debtor

Steve Zimmer Paige in 2005. The parties driving the litigation are Search Market Direct,

Inc. (SMDI) and ConsumerInfo.com (ConsumerInfo).[1] Both seek control of the internet

domain name "freecreditscore.com" (the Domain Name),[2] which once belonged to Paige.

---

[1] The appellants in Case No. 10-4190 (the Confirmation Appeal) and Case No. 10-4220 (the Fee Appeal) are Search Market Direct, Inc., and its wholly owned subsidiary, Magnet Media, Inc. In Case No. 11-4034 (the Adversary Appeal), the appellants are Search Market Direct, Inc., and its owner, Stephen S. May. Generally, throughout this opinion, we refer to the appellants simply as "SMDI."

The appellees in the Confirmation Appeal and Adversary Appeal are Gary E. Jubber (as trustee for the Chapter 11 estate and for the Liquidating Trust) and ConsumerInfo. In the Fee Appeal, Jubber's law firm, Fabian & Clendenin, is also an appellee. Except where Jubber is discussed separately, the appellees are referred to collectively as "ConsumerInfo."

Paige, the debtor in the underlying bankruptcy proceedings, sold his residual ownership interest in the estate to SMDI in September 2006. Confirmation Appeal (Conf. App.), Aplt. App'x at 142–47. He is, for all present purposes, out of the picture in these appeals.

[2] The bankruptcy court provided the following helpful definition of the term "domain name":

A domain name is a name that identifies one or more Internet Protocol (IP) addresses. Domain names are used in the Uniform Resource Locators (URLs) to identify particular web pages. Because the Internet is based on IP addresses, not domain names, every web server requires a Domain Name System (DNS) server to translate domain names into IP addresses. When activated, a domain name directs the viewer to a web page owned and/or controlled by a provider of goods and services which may be viewed. In many

(continued...)

3

SMDI purchased the Domain Name from a third party shortly after Paige filed for bankruptcy. In May 2006, the estate's trustee, Gary E. Jubber (the Trustee), instituted an Adversary Proceeding (AP) to recover it. In December 2006, the bankruptcy court entered a Sale Order approving an Asset Purchase Agreement (APA) under which, inter alia, ConsumerInfo agreed to provide funds to repay the estate's creditors and litigate the AP in exchange for the estate's promise to give ConsumerInfo the Domain Name if it was recovered.

In 2007, the parties proposed competing Chapter 11 plans for the estate. The bankruptcy court denied confirmation of the plan SMDI proposed (the SMDI Plan), under which the Adversary Proceeding would have been settled and SMDI would have kept the Domain Name. The court instead confirmed a Joint Chapter 11 Plan (the Joint Plan) supported by ConsumerInfo and the Trustee. Under the Joint Plan, the Adversary Proceeding was transferred to a Liquidating Trust which continued to litigate it for the estate and ConsumerInfo.

The bankruptcy court resolved the Adversary Proceeding in the Liquidating

[2](...continued)
cases, the viewer may make purchases by use of a credit card number. Some domain names are extraordinarily valuable while others are less valuable. Domain names may be valued according to how much traffic or how many "hits" they bring to the web page. Ones with catchy names that tie into the goods or services to be sold are generally the most valuable. In this case, the Domain Name appears to be a highly lucrative and sought-after asset.

Paige v. Search Market Direct, Inc. (In re Paige), 413 B.R. 882, 887 n.1 (Bankr. D. Utah 2009).

Trustee's favor in 2009. The Liquidating Trustee transferred the Domain Name to ConsumerInfo and the Joint Plan was otherwise substantially consummated. With the exception of a few claims that ConsumerInfo voluntarily subordinated, all of Paige's creditors have been paid in full, with interest. Over objections from SMDI, the Trustee and his law firm have received compensation for their work on behalf of the estate.

We begin this opinion with a brief overview of the issues we resolve today. We then summarize the factual and procedural history underlying SMDI's three appeals. Finally, we consider and reject SMDI's arguments for reversing the bankruptcy court's confirmation of the Joint Plan, for depriving ConsumerInfo of the Domain Name, and for denying the Trustee and his firm certain fees.

## A. Confirmation Appeal

In the Confirmation Appeal, we are concerned with the bankruptcy court's memorandum decision of November 13, 2007, in which it confirmed the Joint Plan and refused to confirm SMDI's competing plan. The Joint Plan was designed to ensure that ConsumerInfo would receive the Domain Name if the estate's claim triumphed in the Adversary Proceeding, while SMDI's competing plan would have settled the Adversary Proceeding and allowed SMDI to keep the Domain Name. SMDI appealed the bankruptcy court's judgment to the district court, which dismissed SMDI's appeal in 2008 on mootness grounds. We reversed that dismissal in 2009. See Search Market Direct, Inc. v. Jubber (In re Paige), 584 F.3d 1327 (10th Cir. 2009). On remand, the district court affirmed the confirmation of the Joint Plan. Because only one plan could be

implemented, the court declined to address whether SMDI's plan was also confirmable.

SMDI appeals the district court's decision. SMDI argues that the Joint Plan did not meet the confirmation requirements of 11 U.S.C. § 1129[3] because it was not proposed in good faith and was not fair and equitable. SMDI also argues that its own plan did satisfy § 1129 and should have been confirmed.

## B. Adversary Appeal

In 2009, the bankruptcy court resolved the Adversary Proceeding in favor of the Liquidating Trustee and against SMDI, ruling that the Domain Name remained at all relevant times the property of the estate. Any post-petition transfers, the court held, were void because they violated the automatic stay and also constituted conversion under Utah state law. SMDI sought a stay of the bankruptcy court's judgment pending appeal. When no stay was granted, the Domain Name was transferred to the Liquidating Trust, which then turned it over to ConsumerInfo. The district court affirmed the bankruptcy court's judgment on the merits. It also affirmed on the alternative basis that SMDI's appeal was moot because the sale of the Domain Name to ConsumerInfo could not be undone.

In the Adversary Appeal, SMDI raises five issues. SMDI argues that the bankruptcy court and district court erred in granting judgment for the estate for four reasons: (1) because the Liquidating Trust and ConsumerInfo lacked standing to prosecute the Adversary Proceeding; (2) because a domain name is not tangible property

_____

[3] Unless otherwise noted, all citations to a "section" or "§" in this opinion are to title 11 of the United States Code.

but rather a contract right, which could not be the subject of a conversion claim under Utah law and which, in any event, expired prior to trial; (3) because turnover of the Domain Name was not available as a remedy; and (4) because the estate and ConsumerInfo's conversion claim in the Adversary Proceeding was preempted by federal bankruptcy law. Finally, SMDI argues (5) that the district court erred in concluding that its appeal was moot.

**C. Fee Appeal**

Under the court-approved APA, ConsumerInfo provided the estate with money to pay the fees that the Trustee and his law firm incurred in prosecuting the Adversary Proceeding. Although both SMDI and ConsumerInfo acquired minor claims against the estate early in the bankruptcy proceedings so that they would have standing to propose Chapter 11 plans, ConsumerInfo subsequently acquired much larger claims against the estate in early 2007. SMDI has argued since that time that the Trustee had a conflict of interest because he was evaluating ConsumerInfo's disputed claims while ConsumerInfo was paying his fees. Accordingly, SMDI has objected to payment of the Trustee and his law firm for much of their work on behalf of the estate.

The bankruptcy court entered an order granting the fees, which SMDI appealed. The Bankruptcy Appellate Panel of the Tenth Circuit (BAP) dismissed the appeal for lack of jurisdiction, concluding that SMDI "ha[d] no direct pecuniary interest in the reversal of the Fee Order" and therefore did not have standing to challenge it. <u>Search Market Direct, Inc. v. Jubber (In re Paige)</u>, 438 B.R. 355, 2010 WL 3699747, at *1 (B.A.P. 10th Cir.

7

Sept. 15, 2010) (unpublished). The BAP denied SMDI's motion for rehearing. <u>Search</u>

<u>Market Direct, Inc. v. Jubber (In re Paige)</u>, No. 08-62, slip op. at 8 (B.A.P. 10th Cir. Nov.

23, 2010). In the Fee Appeal, SMDI appeals the BAP's decisions, arguing that it did have

standing to object to the fees of the Trustee and his firm.

**D. Overview of Legal Conclusions**

We exercise jurisdiction over these cases under 28 U.S.C. § 158(d)(1) and affirm

the decisions of the district court and Bankruptcy Appellate Panel upholding the

bankruptcy court's judgments and fee order. With regard to the Confirmation Appeal, we

hold that the Joint Plan was proposed in good faith, that the Trustee was disinterested, and

that the Joint Plan was fair and equitable. We also agree with the bankruptcy court that

SMDI's plan could not have been confirmed because it was not feasible. We reverse the

district court's ruling that the Adversary Appeal is moot, but we uphold its affirmance of

the bankruptcy court's judgment on the grounds that the automatic stay was violated and

turnover of the Domain Name was an appropriate remedy. Accordingly, we decline to

address whether the bankruptcy court appropriately relied on a conversion theory under

Utah law. Because we conclude that the Trustee was disinterested, we see no reason to

deprive him or his firm of their fees. We do not reach the question of SMDI's standing in

the Fee Appeal because, in light of our other conclusions, it is moot.


**II. BACKGROUND**

**A. General Background**

8

The factual background underlying these cases is lengthy and complicated. We will summarize the history relevant to all three appeals here and discuss additional background below as necessary.

**1. Pre-Bankruptcy History**

In 2000, Steve Zimmer Paige paid Network Solutions, Inc., $70 to register the Domain Name for a three-year period. Paige, 413 B.R. at 889. He renewed this registration in 2003 for $75. Id. at 890. In the two years that followed, Paige formed several credit-repair businesses, including CCS, LLC, and CCS Financial, Inc., and became involved in a joint venture with a credit-repair company called Citizens Credit Bureau, Inc. (CCB). Id. at 889–90. Although Paige transferred registration of the Domain Name to a third party in June 2005, he continued to personally own and control it thereafter. Id. at 912.

**2. Paige Files for Bankruptcy**

In September 2005, after the failure of one of his credit-repair business endeavors, Paige filed for Chapter 7 bankruptcy. Id. at 891. Jubber was appointed trustee for the estate. Initially, Paige did not list the Domain Name as an asset, and he had no other assets of note. In December 2005, however, an anonymous tipster notified the Trustee that Paige might have an interest in the Domain Name. Id. at 896.

**3. The Trustee Begins an Adversary Proceeding to Recover the Domain Name**

The Trustee determined that the Domain Name had been transferred several times after Paige had declared bankruptcy. Ultimately, Stephen May had purchased the

9

Domain Name in an online auction for $350,000. <u>Id.</u> at 898. He had then transferred the registration to SMDI, which licensed its use to another company May owned, Magnet Media, Inc. <u>Id.</u> at 899. Magnet Media quickly began to earn "significant daily revenues" using the Domain Name. <u>Id.</u>

The Trustee asserted that any post-petition transfers of the Domain Name were void and demanded that May return it. When he refused, the Trustee began the Adversary Proceeding on behalf of Paige's estate. <u>Id.</u> May, SMDI, and Magnet Media were among the defendants.

**4. The Trustee Seeks to Sell the Estate's Interest in the Domain Name**

Paige's estate lacked resources to fund litigation of the AP. To raise money for this purpose and to pay the estate's creditors, the Trustee sought to sell an interest in the AP and any rights to the Domain Name that the estate might acquire. <u>See</u> <u>In re Paige</u>, No. 05-34474, slip op. at 2 (Bankr. D. Utah Dec. 8, 2006).

An auction was held in September 2006, at which the only bidders were SMDI and one of its competitors in the credit services industry, ConsumerInfo. ConsumerInfo prevailed with a bid of $1.5 million, but the parties apparently continued to submit bids after the auction closed. <u>Id.</u> at 2. While bidding and negotiations continued over the following months, several important developments took place.

**5. Conversion to Chapter 11**

First, the bankruptcy court granted a motion by Paige to convert the Chapter 7 case

10

to one under Chapter 11.  Id. at 3.  The Trustee filed a motion to reconvert the case, which the court denied.  The court instead appointed the former Chapter 7 trustee, Gary Jubber, as trustee for the estate under Chapter 11.  Id.

### 6. Communications Between ConsumerInfo and the Debtor

Second, Paige engaged in various communications with ConsumerInfo's counsel without the knowledge of Paige's own attorney, Noel Hyde.  In re Paige, 2007 WL 4143212, at *3–4 (Bankr. D. Utah Nov. 13, 2007).  Paige had led SMDI to believe that he would propose a joint Chapter 11 plan with SMDI.  Nonetheless, against Hyde's advice and without his knowledge, Paige repeatedly contacted ConsumerInfo's attorneys, apparently seeking money or some sort of consulting job with ConsumerInfo.  Id. at *11.  He also told ConsumerInfo that he was not represented, and ultimately convinced ConsumerInfo to pay $20,000 to obtain new counsel for him.  Id. at *3.  Meanwhile, he stopped communicating with Hyde or with SMDI.  In early December 2006, Hyde withdrew as Paige's counsel and a new attorney, paid by ConsumerInfo, took his place. Id.

### 7. ConsumerInfo and SMDI Acquire Claims Against the Estate

Third, both SMDI and ConsumerInfo purchased claims against the estate in order to gain standing to propose Chapter 11 plans.  Id. at *2, 4.  SMDI also acquired Paige's "residual interest in his bankruptcy estate consisting of any money or property that is returned, distributed, or abandoned to him through the administration of the case."  Conf. App., Aplt. App'x at 146.

11

**8. The Trustee Moves for Court Approval of a Sale to ConsumerInfo**

On November 14, 2006, the bankruptcy court held a hearing on the Trustee's motion to sell ConsumerInfo the estate's rights to the Domain Name and a co-interest in the AP for $1.9 million. Paige, No. 05-34474, slip op. at 4. Although SMDI had counter-offered to settle the AP with the estate for $1.9 million, the Trustee stated that he preferred ConsumerInfo's offer because ConsumerInfo was able to pay the full sum immediately. Id. SMDI, by contrast, could only pay $1.2 million up front and wished to pay the remaining $700,000 over several months. Id. The Trustee expressed uncertainty that SMDI would be able to make these payments. Id. The APA that ConsumerInfo proposed included the following key terms:

**a. Purchase Price**

ConsumerInfo agreed to contribute two sums of money to the estate. First, it would immediately pay $1.9 million into the estate (the Funds). APA § 1.4. Second, it would contribute up to $200,000 "on an as incurred basis" toward the Trustee's "reasonable costs and expenses" in litigating the AP. APA § 1.6.

**b. The Adversary Proceeding**

In exchange, ConsumerInfo received "a co-interest in the Pending Adversary." APA § 1.1. The estate agreed that the Trustee would "prosecute the Pending Adversary in good faith." APA § 1.5; see also APA § 1.6 (stating that Trustee agreed to "diligently prosecute the Pending Adversary . . . where he believes he has a good faith basis for doing so"). The Trustee further agreed that he would "reasonably consult with

12

[ConsumerInfo] regarding prosecution of the Pending Adversary." APA § 1.5. The APA allowed that the "Trustee in his reasonable business discretion can settle or otherwise compromise the Pending Adversary," but before settling, the Trustee had to (1) consult with ConsumerInfo; (2) obtain bankruptcy court approval for any settlement; and (3) give ConsumerInfo the opportunity to object to or overbid any settlement. APA § 1.5. If the Trustee did settle, he agreed that the estate would immediately refund $1,825,000 of the $1.9 million to ConsumerInfo. The estate would keep the remaining $75,000. APA § 1.5.

### c. The Domain Name

The estate agreed to sell ConsumerInfo "all of [the estate's] right, title and interest, if any, in and to, and relating in any way to, the Domain Name, whether now owned or acquired at any [later] time." APA § 1.1. In addition, the estate agreed that if it recovered money damages in the Adversary Proceeding or any action relating to the Domain Name, it would pay 25% of those recoveries to ConsumerInfo. APA § 1.1(d).

### d. Closings

The APA contemplated two closings. At an "Initial Closing," ConsumerInfo would deliver the $1.9 million to the estate and would receive a co-interest in the Adversary Proceeding and a 25% interest in the monetary recoveries. APA § 8.2(a). At a "Subsequent Closing," the estate was to transfer the Domain Name to ConsumerInfo for no further consideration. APA § 8.2(b). The Subsequent Closing was to occur within ten business days following a "final and nonappealable order" determining that the estate

13

owned the Domain Name. The APA allowed ConsumerInfo to waive this provision and accelerate the closing "so long as there is no stay pending appeal in effect at the time." APA § 8.1.

### e. Chapter 11 Plans

Finally, the Trustee agreed in the APA to file a liquidating Chapter 11 plan consistent with the APA and to oppose any plan inconsistent with the APA if he could do so in good faith. APA § 1.7.

### 9. Following a Hearing, the Bankruptcy Court Approves the APA in the Sale Order

Over SMDI's objection, the bankruptcy court entered a Sale Order approving the APA. Paige, No. 05-34474, slip op. at 5. With regard to the Trustee's preference for ConsumerInfo's offer over SMDI's, the court noted that it gave "significant deference" to the Trustee and his "business judgment discretion." Id. at 11. It specifically stated "SMDI has presented no evidence to suggest that the Trustee's business judgment in this case is tainted or in any way conflicted." Id. The court, however, expressed "grave concerns" with ConsumerInfo's contacts with Paige and its payment of Paige's attorney's retainer. Id. at 5 n.3. Nonetheless, it concluded that the evidence presented on the issue was vague and did not preclude approval of the APA. Id. SMDI did not appeal the court's Sale Order.

### 10. ConsumerInfo Acquires the CCB Claims

As noted above, both SMDI and ConsumerInfo purchased nominal claims against

14

the estate during the early stages of Paige's bankruptcy in order to gain standing as creditors of the estate to propose Chapter 11 plans. In January 2007, ConsumerInfo acquired significantly larger claims from CCB, which was a creditor of Paige's estate (the CCB Claims).

From 2003 to 2005, Paige was a director, officer, and co-owner of CCB. Fee Appeal (Fee App.), Supp. Aplee. App'x at 97–107. The company utilized the Domain Name and developed a website which allowed users to estimate their credit score. Id. at 98. In October 2006, CCB filed a proof of claim against the estate for substantial expenses it had incurred in the development of the Domain Name. CCB amended the amount of this unsecured claim, Claim 27-2, to $131,180.00 in January 2007. See Fee App., Aplt. App'x at 204–06.

Shortly thereafter, ConsumerInfo bought Claim 27-2 from CCB. ConsumerInfo also purchased any and all other interests in the Domain Name that CCB might have. Paige, 2007 WL 4143212, at *4. On January 31, 2007, ConsumerInfo filed Claim 42-1, in which it asserted a secured claim in the amount of $2.1 million, as well as a constructive trust and beneficial ownership of the Domain Name, based on the rights ConsumerInfo had acquired from CCB. Fee App., Aplt. App'x at 207–08.

Claim 42-1 was based on several different theories. ConsumerInfo alleged conversion—that Paige had unlawfully taken CCB's interest in the Domain Name. Fee App., Aplee. Supp. App'x at 101. It also alleged that Paige had breached his fiduciary duty to CCB when he sold the Domain Name for his own gain without offering his

15

corporation the opportunity to purchase it. Id. at 104. Finally, like Claim 27-2, Claim 42-1 asserted unjust enrichment based on the money CCB had expended on the Domain Name's development. Id. at 106.

With those claims, ConsumerInfo became simultaneously (1) the largest creditor of the estate; (2) the source of funding for the estate, the Trustee, and the Trustee's law firm in the AP; and (3) the holder of a claim to ownership of the Domain Name that conflicted with the estate's claim to it in the AP. This was, the district court aptly noted, an "awkward development in the case." Search Market Direct, Inc. v. Jubber (In re Paige), 439 B.R. 786, 794 (D. Utah 2010).

Several other odd developments followed. First, SMDI sought ConsumerInfo's joinder as a necessary party in the AP, arguing that Claim 42-1 was directly adverse to the estate's claim to the Domain Name. SMDI also asked the Trustee to object to ConsumerInfo's claims, and then itself sought to object when he refused. Conf. App., Aplt. Br. at 13, 16. The bankruptcy court ruled that SMDI lacked standing to do so because the Trustee was responsible for handling claims, and he had not unreasonably declined to object. Id. at 17. The court did, however, order ConsumerInfo's joinder as a defendant in the AP. Id. at 16.

At this point, ConsumerInfo abandoned Claim 42-1's assertion of ownership of the Domain Name (though it still asserted an unsecured claim for $2.1 million). Paige, 2007 WL 4143212, at *4. The Trustee then sought to join ConsumerInfo as a plaintiff, rather than as a defendant, which the bankruptcy court allowed. Conf. App., Aplt. Br. at 19. At

16

SMDI's insistence, the bankruptcy court held a hearing to estimate the value of Claim 42-1, though it specified that the estimate was only binding for purposes of plan confirmation.  Id. at 10.  The court estimated that Claim 42-1 was likely to succeed based on a theory of breach of fiduciary duty or unjust enrichment (but not conversion), and estimated its value at $225,000.  Id.

## B. Confirmation of the Joint Plan

### 1. SMDI and ConsumerInfo Propose Chapter 11 Plans

SMDI filed its plan for reorganization of Paige's estate in June 2007.  Paige, 2007 WL 4143212, at *5.  Thereafter, ConsumerInfo and the Trustee together proposed the Joint Plan.  Id.  Both plans proposed to pay unsecured creditors in full with 10% interest.  Id. at *6.  And both plans envisioned the liquidation, in effect, of the estate's only valuable asset—the Domain Name.  Under the SMDI Plan, the estate would be required to drop the AP and let SMDI keep the Domain Name.  Under the Joint Plan, the AP would continue until it was resolved; if it was resolved in the estate's favor, ConsumerInfo would receive the Domain Name as required under the APA.

Under SMDI's plan, SMDI would pay $2.6 million into the estate in order to pay all claims in full (except the CCB Claims).  Id.  A new trustee would be appointed, and that trustee would be required to dismiss the AP and transfer any interests the estate had in the Domain Name to SMDI.  Id.  The trustee would then refund $1,825,000 to ConsumerInfo—the price, under the APA, for the estate settling the AP without ConsumerInfo's consent.  Id.

17

Under the Joint Plan, by contrast, the AP would continue (with funding from ConsumerInfo), and the Trustee would turn the Domain Name over to ConsumerInfo if the estate won. ConsumerInfo would contribute up to an additional $300,000 to ensure the full repayment of creditors, and it would subordinate the CCB Claims so that they would only be paid if money remained after paying all other claims. SMDI's residual interest, however, would not receive any money until the subordinated claims had been paid in full. The estate would become a Liquidating Trust; Jubber would cease to be the Chapter 11 Trustee and become the Liquidating Trustee, and the United States Trustee would be the only party with standing to object to his fees.

The Joint Plan provided that SMDI could object to the CCB Claims if it wished to do so, but only when the AP had concluded—and only then if money was left over in the estate that could go toward paying those claims. Id. In addition, the Joint Plan stated explicitly that if the Liquidating Trust won the AP, the Trustee would not voluntarily accept the monetary value of the Domain Name in lieu of the Domain Name itself. Conf. App., Aplt. App'x at 2074.

Both plans, the bankruptcy court noted, were proposed with the same goal in mind:

> Throughout this process, it has been the Court's observation that the proponents' true intentions throughout this case ha[ve] been to acquire the right to own and use the Domain Name . . . . Payment in full to the creditors is important but secondary to them in that the parties are primarily concerned with acquiring the Domain Name or the rights to it.

Paige, 2007 WL 4143212, at *7.

**2. The Bankruptcy Court Confirms the Joint Plan and Denies Confirmation**

18

**of the SMDI Plan**

Following seven days of hearings, the bankruptcy court confirmed the Joint Plan

and denied confirmation of the SMDI Plan. We discussed the bankruptcy court's

conclusions regarding SMDI's plan in Paige, 584 F.3d at 1333.

> The court found that SMDI's plan did not comply with 11 U.S.C. § 1129(a)(1) because it placed ConsumerInfo into a separate class than other similarly situated creditors. The court acknowledged, however, "that this might make little difference here because SMDI's plan purports to pay all creditors . . . ." Further, the bankruptcy court ruled that SMDI's plan violated 11 U.S.C. § 1129(a)(3), which requires that a plan be proposed in "good faith." Specifically, the court found that SMDI's plan inappropriately compelled the settlement of the AP. The court determined that the compelled settlement was inappropriate because the trustee, not the creditors, must move for approval of a settlement, that even if SMDI could propose a settlement, SMDI had failed to show the court that a settlement should be approved, and that this compelled settlement "could easily be construed as a breach of Trustee's duties" to ConsumerInfo under the APA. The court further held that SMDI had failed properly to appeal the approval of the APA and, even if its challenge to the confirmation of the Joint Plan could be construed as a challenge to the sale under the APA, SMDI had failed to prove "that the sale was approved by mistake or inadvertence, or that the Sale Order lacked adequate evidentiary basis."

Id. (citations omitted).

The bankruptcy court also concluded that the SMDI Plan could not be confirmed

because it was not feasible, as required under § 1129(a)(11). The court reasoned that

settlement of the AP would breach the estate's duties under the APA, exposing the estate

to an administrative claim for damages by ConsumerInfo. Paige, 2007 WL 4143212, at

*20. Whether or not the claim would ultimately succeed, the bankruptcy court

"estimate[d] that the cost of objecting alone would be very substantial." Id. The court

19

determined that SMDI's plan provided insufficient resources for contesting this claim, much less for satisfying a potential judgment. Id. A successful administrative claim on ConsumerInfo's part, the court feared, could require the plan trustee to seek disgorgement from creditors who had already been paid. Id. The SMDI Plan, as a result, was not feasible. Id.

The Joint Plan, the bankruptcy court concluded, satisfied the requirements of § 1129(a). The bankruptcy court rejected SMDI's arguments that a lack of good faith under § 1129(a)(3) was demonstrated by ConsumerInfo's contacts with Paige or by a conflict of interest on the part of the Trustee arising from his duties to ConsumerInfo under the APA. Id. at *9, 14. The bankruptcy court also rejected the contention that the Joint Plan was not "fair and equitable" as required by § 1129(b)(1). Id. at *19.

**3. SMDI Appeals and the District Court Dismisses the Appeal as Moot**

SMDI appealed the bankruptcy court's confirmation decisions to the district court.

On the merits, SMDI argued that the bankruptcy court's reasons for finding fault with SMDI's plan were in error; that ConsumerInfo had engaged in unethical communications with the debtor, which led to its paying the debtor $20,000 and convincing him to abandon his support for SMDI's plan; that the trustee was not "disinterested" in his dealings with ConsumerInfo; that the trustee's interest in the disposition of the estate's assets inappropriately influenced his dealings in this case; that the Joint Plan should not have been confirmed because it wrongly denied payment to SMDI on SMDI's claims against the estate; and that certain aspects of the Joint Plan were not "fair and equitable" to SMDI. While that appeal was pending, however, some significant post-confirmation events took place which substantially changed the posture of SMDI's appeal.

Under the Joint Plan, the Plan was to become effective only after, inter alia, any pending appeals were resolved. However, the Joint Plan also enabled

20

Mr. Jubber and ConsumerInfo to waive those requirements. They in fact waived those requirements in October 2007, thus paving the way for the Plan to be substantially consummated despite SMDI's pending appeal. And, once the Joint Plan became effective, the trustee took substantial steps to pay creditors, object to creditors' claims, and prosecute the AP. In turn, ConsumerInfo made significant payments to the trustee to cover the estate's administrative costs and creditors' claims.

Paige, 584 F.3d at 1333–34 (footnote and citations omitted).

SMDI sought a stay in bankruptcy court to prevent the parties from implementing the Joint Plan while its appeal was pending. The bankruptcy court denied the stay request. SMDI's request for a stay in district court was denied as well. SMDI did not appeal those denials to this court. When SMDI appealed the bankruptcy court's decision confirming the Joint Plan and denying confirmation of SMDI's plan, the district court concluded that the case was constitutionally and equitably moot because the steps the Trustee had taken to carry out the Joint Plan could not be undone.

**4. We Reverse the District Court's Mootness Ruling**

SMDI appealed, and we reversed the district court's mootness ruling and remanded for the district court to consider SMDI's appeal on the merits. See Paige, 584 F.3d at 1348–49. We acknowledged that we had not "thoroughly or even adequately evaluated the merits of SMDI's claims," but we noted that "a quick look at th[e] appeal suggests the claims may have some merit." Id. at 1348. We observed that SMDI "allege[d] serious conflicts of interest" and raised "questions about whether SMDI's competing proposal ha[d] received an adequate and balanced appraisal." Id. "In many ways," we concluded, "the claims raised go to the very integrity of the bankruptcy

21

process in this case." Id.

**5. On Remand, the District Court Affirms Confirmation of the Joint Plan**

On remand, the district court affirmed the bankruptcy court's confirmation of the Joint Plan on the merits. Paige, 439 B.R. at 788. The district court declined, however, to decide whether the bankruptcy court had properly denied confirmation of the SMDI Plan. Because, under § 1129(c), only one plan could be confirmed, the district court concluded that "whether or not the bankruptcy court erred in refusing to confirm the SMDI Plan is merely academic." Id. at 800–01. Before us now is SMDI's appeal from the district court's order, in which SMDI contends that its plan—under which the Adversary Proceeding was to be settled—should have been confirmed in 2007 in lieu of the Joint Plan. While the parties battled over their competing Chapter 11 plans, however, the Adversary Proceeding moved forward.

**C. The Adversary Proceeding**

**1. The Bankruptcy Court Resolves the AP in Favor of the Liquidating Trustee**

In 2007, pursuant to the Joint Plan, the AP was transferred from the estate to a Liquidating Trust for which Jubber continued to serve as trustee. The AP trial began in November 2008 and spanned nineteen days over the course of eight months. On September 18, 2009, shortly before we issued our opinion reversing the district court's mootness determination, see Paige, 584 F.3d at 1327, the bankruptcy court entered judgment in the Adversary Proceeding. In a lengthy and thorough opinion, the bankruptcy court made the following key determinations:

22

First, the bankruptcy court held that ConsumerInfo and the Trustee had standing to pursue the AP. It rejected the argument advanced by SMDI that both parties lacked standing to recover the Domain Name under the relevant Code provisions because doing so would bring no further benefit to the estate. Paige, 413 B.R. at 907. Next, the court determined as a matter of fact that the Domain Name remained the property of Paige and his estate at all relevant times both before and after he filed for bankruptcy. Id. at 909. The court ruled, therefore, that all transfers of the Domain Name post-dating the petition for bankruptcy were void ab initio because they were in violation of the automatic stay. Id. at 915. "From the law's point of view," the court explained, "they simply did not happen." Id. Thus, the bankruptcy court concluded, the Domain Name belonged to the estate.

"As an alternative basis for the foregoing conclusion," the bankruptcy court ruled that SMDI and the parties from whom it obtained the Domain Name had committed conversion. Id. at 916. In reaching this conclusion, the court rejected SMDI's arguments that a claim for conversion under Utah state law was preempted by the Bankruptcy Code, id., and that a domain name, under Utah law, was a service contract rather than tangible property capable of being converted, id. at 918. To the contrary, the court held that "like web pages and software, the Domain Name at issue is a type of tangible property that is capable of conversion." Id. The court held that title was deemed to be in the Trustee's or the estate's name and ordered turnover of the Domain Name to the Liquidating Trust under § 542(a) of the Bankruptcy Code. Id. at 920–21. The court did not award any

23

damages for SMDI's use of the Domain Name. Id. at 920.

SMDI appealed the bankruptcy court's judgment to district court, but it was unable to obtain a stay of the order from either court. It did not appeal the denial of a stay to this court. ConsumerInfo stipulated, however, that it would not transfer the Domain Name to any third party while SMDI's appeals were pending. Adversary Appeal (Adv. App.), Aplt. App'x at 836.

**2. The Liquidating Trust Gives ConsumerInfo the Domain Name**

ConsumerInfo chose to waive the provision of the APA that would have delayed the Subsequent Closing until issuance of a "final and nonappealable order" giving the estate ownership of the Domain Name. See APA § 8.1. Instead, ConsumerInfo elected to receive the Domain Name from the Liquidating Trust immediately. ConsumerInfo represents that it owns and controls the Domain Name now. Adv. App., Aplee. Br. at 3.

**3. The District Court Affirms**

The district court affirmed the bankruptcy court's resolution of the AP on two alternative grounds. First, it affirmed on the merits, agreeing with the bankruptcy court that ConsumerInfo and the Trustee each had standing to pursue the AP, Search Market Direct, Inc. v. Jubber (In re Paige), 443 B.R. 878, 895–96 (D. Utah 2011); that the Domain Name was tangible property under Utah law, and not a service contract, id. at 902; and that turnover was an appropriate remedy because, contrary to SMDI's arguments, the APA and Joint Plan did not make the Domain Name "of inconsequential value to the estate," id. at 903. Because it had affirmed the bankruptcy court's judgment

24

on other grounds, the district court declined to address whether a state law claim for conversion was preempted by the Bankruptcy Code. Id.

Second, as an alternative basis for affirming the bankruptcy court's judgment, the district court held that SMDI's appeal was moot under § 363(m) of the Code. Id. at 908. Section 363(m) provides that if a party purchased property from a bankruptcy estate in good faith pursuant to a sale order (whether or not the party knew that an appeal of the order was pending) and the court did not grant a stay, the validity of the sale is not affected even if the order authorizing it is reversed on appeal. SMDI had not obtained a stay of the Sale Order or of the bankruptcy court's judgment in the Adversary Proceeding. The district court determined that ConsumerInfo had purchased the Domain Name in good faith because the Sale Order (which SMDI never appealed) said so: in Paragraph 8 of the order, the bankruptcy court had written that "[t]he transactions contemplated in the [APA] have been negotiated in good faith and at arms length. The Purchaser [ConsumerInfo] is entitled to all of the protections of Section 363(m) of the Bankruptcy Code." Id. at 908. Because § 363(m) shielded ConsumerInfo from having to give up the Domain Name, the court concluded it could not provide the relief SMDI sought—return of the Domain Name. Thus, it declared the appeal moot. Id.

On appeal to this court, SMDI argues that the Liquidating Trust should not have been able to obtain the Domain Name under its statutory claims or its state law cause of action. SMDI also insists that its appeal is not moot. Adv. App., Aplt. Br. at 1–2. At this juncture, however, we note that SMDI does not challenge the bankruptcy court's essential

25

findings with regard to "the complex twists and turns of the underlying facts" in this case. Adv. App., Aplee. Br. at 1. In other words, if the Trustee or ConsumerInfo had standing and the right to obtain turnover of the Domain Name—or if the Domain Name was tangible property and a conversion action was not preempted—then SMDI does not dispute that the Domain Name did belong to the estate and now properly belongs to ConsumerInfo.

## D. The Trustee's Fees

Throughout all of the proceedings outlined above, the Trustee has employed himself and his law firm, Fabian & Clendenin, as legal counsel for the estate and for the Liquidating Trust. This employment was approved by the bankruptcy court. Paige, 2010 WL 3699747, at *7. ConsumerInfo was, at all times, represented by separate counsel. Id. at *7 n.69.

### 1. SMDI Objects to the Trustee's Fees

The Trustee filed several interim applications for attorney fees and costs, which the bankruptcy court substantially granted. Id. at *7 & n.70. After ConsumerInfo acquired the CCB Claims in January 2007, SMDI began to object to this compensation on the grounds, among others, that the Trustee and his firm were not disinterested and held or represented interests adverse to the estate. Fee App., Aplt. Br. at 5 (citing Fee App., Aplt. App'x at 810–15, 1245–60). In all, SMDI says it objected to about $375,000 in fees and costs on the basis that the Trustee and his firm lacked disinterestedness. Fee App., Aplt. Br. at 6; Aplt. Reply Br. at 11 n.15.

26

## 2. The Bankruptcy Court Overrules SMDI's Objections

In each instance, the bankruptcy court overruled SMDI's objections.  Id.  The bankruptcy court entered an order on June 16, 2008, approving the Final Fee Applications of the Trustee and his Firm for their work on behalf of the estate up until its assets were transferred to the Liquidating Trust under the Joint Plan.  Fee App., Aplt. App'x at 1347–52.  SMDI appealed this Final Fee Order to the BAP.[4]

## 3. The BAP Affirms the Bankruptcy Court

The BAP did not reach the merits of SMDI's argument that the Trustee and his law firm were not disinterested and therefore were not entitled to fees.  Instead, it dismissed the case on the basis that SMDI lacked standing to object to the Trustee's fees.  The BAP concluded that SMDI was not "directly, adversely and pecuniarily" affected by the Final Fee Order and therefore was not a "person aggrieved" with standing to challenge it. Paige, 2010 WL 3699747, at *10.

The BAP reasoned that even if the Trustee were required to disgorge his fees to the estate or the Liquidating Trust, SMDI could not receive any of this money by virtue of its claims against the estate; those claims had already been paid in full, with interest.  Id. at *10.  Moreover, the BAP concluded that Paige's residual interest—held by SMDI—could not receive any disgorged fees.  The only funds that could be disgorged had come from ConsumerInfo, in the form of its $1.9 million and $200,000 contributions.  But § 1.4 of

---

[4] The Joint Plan did not require Jubber to obtain court approval for his fees as Liquidating Trustee post-confirmation.

the court-approved APA specified that "[n]one of the amounts provided by [ConsumerInfo] shall benefit [the Debtor] or his purported assignees as residual interest holders." Id. (quoting APA § 1.4) (emphasis and internal quotation marks omitted).

The BAP also considered SMDI's argument that it had standing as a proponent of the SMDI Plan. Id. at *11. If confirmation of the Joint Plan were reversed and the SMDI Plan were confirmed, SMDI argued that it would become the party responsible for paying the estate's administrative expenses. A reduction in those expenses from disallowing the Trustee's fees would ultimately redound to the benefit of SMDI under its plan.

The BAP rejected these arguments for two reasons. First, it concluded that any benefit to SMDI as a plan proponent would be merely indirect, and therefore insufficient to support standing to object to the Trustee's fees. Id. Second, the BAP noted that SMDI's plan (which turned on the estate settling the AP and allowing SMDI to keep the Domain Name) could not be put into action unless SMDI could get the Domain Name back. Id. A year before the BAP issued its opinion, SMDI had lost the AP and failed to obtain a stay. The Domain Name had been transferred to the Liquidating Trust and then to ConsumerInfo.

The BAP concluded that the likelihood was "too remote and speculative" that SMDI would not only overturn the Joint Plan and obtain confirmation of its own plan, but also prevail in the Adversary Appeal and get the Domain Name back. Id. Additionally, the BAP observed that if SMDI did prevail in the Adversary Appeal, it would gain the Domain Name as a result. With the Domain Name in hand and its claims against the

28

estate paid off with interest, SMDI would have no reason to propose a plan and become responsible for the estate's administrative fees. Id. at \*11 n.101. Thus, even prevailing in the Adversary Appeal would not give SMDI standing to object to the Trustee's fees. Id.

### 4. The BAP Denies SMDI's Motion for Rehearing

The BAP denied SMDI's motion for rehearing. Paige, No. 08-62, slip op. at 8. In the process, it commented that even if it were to reach the merits of SMDI's challenge, it would consider the Trustee to have been disinterested. It detected no lack of disclosure on the part of the Trustee or the Firm regarding possible conflicts. Id. at 6–7. Moreover, it emphasized that any conflict that did exist was not personal to the Trustee, but rather the inescapable result of the Trustee's court-approved duties under the APA.

SMDI appealed the BAP's decision to this court.

## III. ANALYSIS

## A. Confirmation Appeal

### 1. Introduction

In the Confirmation Appeal, we must determine whether the bankruptcy court erred in confirming the Joint Plan and denying confirmation of the SMDI Plan. To be confirmable, a plan must comply with all applicable provisions of 11 U.S.C. § 1129. The proponent of a plan must demonstrate compliance by a preponderance of the evidence. See Heartland Fed. Savs. & Loan Ass'n v. Briscoe Enters., Ltd., II (In re Briscoe Enters., Ltd., II), 994 F.2d 1160, 1165 (5th Cir. 1993).

On appeal, SMDI argues first that the Joint Plan should not have been confirmed

because it was not proposed in good faith, as required by § 1129(a)(3). SMDI also argues that the Joint Plan was not fair and equitable, as it had to be under § 1129(b) since SMDI's impaired residual interest did not accept the plan. Specifically, SMDI contends that the Joint Plan was not proposed in good faith for two reasons: (1) because the Trustee who supported the Joint Plan was not disinterested, and (2) because ConsumerInfo engaged in bad faith, unethical communications with the debtor. The first argument focuses on the Trustee and his duties to the estate and ConsumerInfo under the APA, and it is concerned only with the Trustee's disinterestedness after January 2007; this is when ConsumerInfo acquired the CCB Claims, and when the Trustee, according to SMDI, became conflicted. SMDI's second good faith argument, by contrast, focuses on ConsumerInfo and its interactions with the debtor. All of the conduct SMDI complains of in this regard took place before the bankruptcy court entered the Sale Order approving the APA. SMDI argues that the bankruptcy court, in rejecting both arguments, applied an overly narrow "good faith" standard.

SMDI also argues that three provisions of the Joint Plan were not fair and equitable. First, as part of the Joint Plan, the estate agreed that the Liquidating Trustee would "not . . . voluntarily accept or elect money in lieu of recovery of the Domain Name Assets if he prevails in the Adversary Proceeding." Liquidating Trust Agreement § 1.1 (Conf. App., Aplt. App'x at 2074). SMDI argues that the Trustee retained the option of accepting a monetary recovery in lieu of the Domain Name under the APA, and that electing a money remedy would have been advantageous to the estate. The estate, SMDI

30

argues, received inadequate consideration under the Joint Plan for waiving this right. Conf. App., Aplt. Br. at 48. Second, the Joint Plan authorized SMDI to object to the CCB Claims, but provided that such an objection could not be made until after the AP was concluded. SMDI argues that this term was unfair because it was inserted only to prejudice SMDI, which was the sole party that stood to benefit from objecting to the CCB Claims. Id. at 50. Finally, the Joint Plan only permitted the United States Trustee to object to the Liquidating Trustee's fees. SMDI contends that this provision, too, was unfair because it was meant to prejudice SMDI. Id.

### 2. Standard of Review

We review the bankruptcy court's legal conclusions de novo and its underlying factual findings for clear error. Paul v. Inglhart (In re Paul), 534 F.3d 1303, 1310 (10th Cir. 2008). Good faith for purposes of § 1129(a)(3) is ordinarily a finding of fact that we review for clear error. See In re 203 N. LaSalle St. P'ship, 126 F.3d 955, 969 (7th Cir. 1997) ("[T]he bankruptcy court's finding that the plan was proposed in good faith is a finding of fact to which we owe deference.") rev'd on other grounds by Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship, 526 U.S. 434 (1999). Likewise, whether a plan is fair and equitable is generally a question of fact. See Citibank, N.A. v. Baer, 651 F.2d 1341, 1346 (10th Cir. 1980). SMDI, however, argues that the bankruptcy court adopted overly narrow definitions of "good faith" and "fair and equitable." We review de novo the bankruptcy court's construction of these terms. See Osborn v. Durant Bank & Trust Co. (In re Osborn), 24 F.3d 1199, 1203 (10th Cir. 1994) abrogated in part

31

on other grounds by Eastman v. Union Pac. R.R., 493 F.3d 1151, 1156 (10th Cir. 2007) ("[W]hen a lower court's factual findings are premised on improper legal standards or on proper ones improperly applied, they are not entitled to the protection of the clearly erroneous standard, but are subject to de novo review."); Neiberger v. Fed Ex Ground Package Sys., Inc., 566 F.3d 1184, 1189 (10th Cir. 2009) (applying de novo review to determine whether the proper legal standard was applied). Although we may look to the district court's intermediate appellate analysis to inform our review, we owe no deference to that court's decision. Paul, 534 F.3d at 1310.

### 3. Confirmation of the Joint Plan

#### a. Good Faith

##### i. The Definition of Good Faith

Section 1129(a)(3) provides that a Chapter 11 plan can only be confirmed if it was "proposed in good faith and not by any means forbidden by law." The Code does not explain what "good faith" means in this context. See 6 Norton Bankr. L. & Prac. § 112:10 (3d ed. 2012). "Case law under the Code, however, has tended to define the good-faith requirement as requiring only that there is a reasonable likelihood that the plan will achieve a result consistent with the standards prescribed under the Code." Id. In Travelers Ins. Co. v. Pikes Peak Water Co. (In re Pikes Peak Water Co.), 779 F.2d 1456 (10th Cir. 1985), we quoted the bankruptcy court's articulation of the standard:

> The test of good faith is met if there is a reasonable likelihood that the plan will achieve its intended results which are consistent with the purposes of the Bankruptcy Code, that is, is the plan feasible, practical, and would it enable the

32

company to continue its business and pay its debts in accordance with the plan provisions.

Id. at 1459.  We noted that "[i]n finding a lack of good faith, courts have looked to whether the debtor intended to abuse the judicial process and the purposes of the reorganization provisions."  Id. at 1460.  "Not confirming the plan for lack of good faith is appropriate particularly when there is no realistic possibility of an effective reorganization and it is evident that the debtor seeks merely to delay or frustrate the legitimate efforts of secured creditors to enforce their rights."  Id.

We reaffirm today that the test of good faith under § 1129(a)(3) focuses on whether a plan is likely to achieve its goals and whether those goals are consistent with the Code's purposes.  ConsumerInfo argues, and we agree, that a plan proponent's self-interested motive does not necessarily indicate a lack of good faith.  But SMDI does not take issue with ConsumerInfo's motivations in proposing the Joint Plan.  Indeed, it is surely beyond dispute that both parties proposed their plans in pursuit of their own self-interested goal.  Rather, we understand SMDI's arguments to be that the Joint Plan was not proposed in good faith because ConsumerInfo's co-proponent, the Trustee, was corrupted by a conflict of interest of ConsumerInfo's creation, and because ConsumerInfo had taken unethical steps to prevent SMDI from jointly proposing a competing plan with the debtor.  Applying Pikes Peak, the bankruptcy court concluded that the Joint Plan was proposed in good faith because it was both feasible and workable and sought to achieve results consistent with the purposes of the Bankruptcy Code.  Paige, 2007 WL 4143212,

33

at *14.  The bankruptcy court did not err.

A plan may, in light of its proponent's actions or relationships, be incapable of achieving goals consistent with the Code.  The bankruptcy court in In re Fiesta Homes of Ga., Inc., 125 B.R. 321, 325 (Bankr. S.D. Ga. 1990), for instance, recognized that the proponent's conflicts of interest made diligent pursuit of certain preference actions unlikely and made an appearance of impropriety inevitable.  Accordingly, the proposed plan was not likely to achieve a result consistent with the Code—namely, "maximum recovery by and fair distribution to creditors."  Id.; see also In re Coram Healthcare Corp., 271 B.R. 228, 240 (Bankr. D. Del. 2001) ("We easily conclude from the totality of circumstances . . . that a continuous conflict of interest by the CEO of the Debtor precludes the Debtors from proposing a plan in good faith under 1129(a)(3).").  In In re Unichem Corp., 72 B.R. 95, 100 (Bankr. N.D. Ill. 1987), the court concluded that the plan at issue was designed to reward its proponent, an individual whose "inequitable conduct was the cause of [the debtor's] financial distress."  Such a result was inherently "in conflict with the objectives and purposes of the Bankruptcy Code."  Id.  Thus, we do not rule out the possibility that a plan could be unconfirmable under § 1129(a)(3) because of the proponent's conflicts of interest or improper conduct.  Nonetheless, we affirm the bankruptcy court's decision because no conflict of interest or unethical action on the part of ConsumerInfo or the Trustee demonstrated a lack of good faith in this case.

### ii. The Trustee Was Disinterested

SMDI argues that conflicts of interest prevented Jubber from proposing a plan as a disinterested trustee. This argument turns on the Bankruptcy Code's requirement that trustees be "disinterested." § 1104(b), (d). In relevant part, the Code defines a disinterested person as someone who "does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason." § 101(14)(C).[5] SMDI relies on the "for any other reason" portion of this definition. It contends, in essence, that ConsumerInfo's payment to the estate of the Trustee's litigation expenses under the APA—and its promise to continue to pay his fees as Trustee for the Liquidating Trust—created a disabling conflict. According to SMDI, the resulting "lack of disinterestedness tainted his administration of the case, the Joint Plan, and the plan confirmation process." Conf. App., Aplt. Br. at 32.

"These are serious matters that . . . go to the very integrity of the bankruptcy process in this case." Paige, 584 F.3d at 1348. We hold bankruptcy trustees and the professionals they employ to a high standard where conflicts of interest are concerned; the "catch-all clause" upon which SMDI relies "is broad enough to exclude [a trustee] with some interest or relationship that 'would even faintly color the independence and impartial attitude required by the Code and Bankruptcy Rules.'" Winship v. Cook (In re

_____

[5] The Trustee's law firm was also subject to the disinterestedness requirement. Professionals employed by a trustee to administer the estate must be disinterested, and also cannot "hold or represent an interest adverse to the estate." § 327(a).

Cook), 223 B.R. 782, 789 (B.A.P. 10th Cir. 1998) (quoting In re BH&P, Inc., 949 F.2d 1300, 1309 (3d Cir. 1991)). We are satisfied, however, that no such interest or relationship was present here.

We emphasize, first, that although ConsumerInfo provided the funds which paid the Trustee's fees, ConsumerInfo was not paying the fees directly. Rather, the estate itself paid the Trustee (upon his application for and receipt of the court's approval), with money the estate received from ConsumerInfo pursuant to the court-approved APA. As the district court noted, "SMDI has failed to cite . . . a single case where a trustee's court approved and non-personal relationships resulted in the denial of . . . confirmation [of a] plan because the trustee was not disinterested." Paige, 439 B.R. at 793. We agree with the view the BAP expressed in the Fee Appeal that the bankruptcy court's Sale Order—and not the Trustee or ConsumerInfo—was the source of any potential conflict or appearance of impropriety. Paige, 2010 WL 3699747, at *7 n.74; Paige, No. 08-62, slip op. at 7–8. SMDI never appealed or challenged that order. See Paige, 2007 WL 4143212, at *9. We recognize, as a general proposition, that "[a]n attorney representing a debtor should not receive payment, either directly or indirectly, from any of the creditors." In re Huntmar Beaumeade 1 Ltd. P'ship, 127 B.R. 363, 365 (Bankr. E.D. Va. 1991) (quoting In re WPMK, 42 B.R. 157, 163 (Bankr. D. Haw. 1984)) (internal quotation marks omitted). But under the circumstances of this case, we are unwilling to take this principle so far as to bar the estate from paying the Trustee and his firm with

36

funds the estate received under a court-approved asset sale.[6]

A contrary conclusion, we believe, would have placed the estate in an untenable position. SMDI asks us to hold that the Trustee lost his disinterested status after the APA had already been approved, when ConsumerInfo acquired the CCB Claims. Conf. App., Aplt. Br. at 32. But as the BAP noted in the Fee Appeal, any other trustee stepping into Jubber's shoes at that point would have been subject to the same obligations to ConsumerInfo under the APA, and any such trustee would have been paid by the estate with money from ConsumerInfo.[7] Thus, if the Trustee was not disinterested, we fail to

---

[6] We note that nothing in the record suggests that ConsumerInfo deliberately delayed asserting the CCB Claims so that it could first obtain court approval of the APA and then create a conflict. CCB filed its proof of claim in October 2006 for expenditures it made on development of the Domain Name. Fee App., Aplee. Br. at 10. In December, the court entered the Sale Order. CCB amended its claim in January 2007, and ConsumerInfo bought CCB's rights and interests in the Domain Name that same month. As the Trustee points out in his Fee Appeal response brief, ConsumerInfo's actions look less like a deliberate attempt to manufacture a court-endorsed conflict of interest, and more like an effort to "hedg[e] its bets" once it discovered that a new party might have a claim to the Domain Name. Id. at 32.

[7] The BAP reasoned as follows:

We observe, as a factual matter, that even if the Trustee and Counsel resigned from representing the estate when ConsumerInfo purchased the CCB conversion claim (as SMDI contends should have occurred), any successor trustee and its counsel would have inherited exactly the same alleged "adversity" or "conflict" that SMDI imputes to the Trustee and Counsel. The APA and Sale Order imposed obligations on the estate, the breach of which could have exposed the estate to litigation for specific performance and/or the assertion of an administrative claim by ConsumerInfo. SMDI contends that those very duties required the Trustee to favor ConsumerInfo's interests over the interests of the estate's other creditors, and created a conflict between the Trustee and the estate. This argument was rejected by the bankruptcy court in

(continued...)

37

see how any substitute trustee could have been disinterested either.  SMDI suggests that special counsel or an examiner could have been appointed for the purpose of evaluating the CCB Claims.  Conf. App., Aplt. Br. at 36 n.191.  But since all of the money in the estate came from ConsumerInfo, any such professional still would have been receiving payment from ConsumerInfo via the estate, just as the Trustee and his firm did.  SMDI also argues that it should have been allowed to object to the CCB Claims.  Id.  The bankruptcy court, however, told SMDI that it could contest ConsumerInfo's claims by

[7](...continued)
the unappealed Sale Order when it overruled "on [its] merits with prejudice" SMDI's objection that the APA required the Trustee to "surrender [his] business judgment and independence to ConsumerInfo."

Under SMDI's interpretation of Sections 327(a) and 101(14), no one could have qualified to be employed to represent the estate or to carry out the estate's duties under the APA and Sale Order because every successor trustee would be faced with the same circumstances and thus the same alleged conflict.  The alleged conflict was inherent in the position of trustee as a representative of the estate; it is not personal to this Trustee or Counsel.

Paige, 2010 WL 3699747, at \*7 n.74.  The BAP stood by this analysis in its denial of SMDI's motion for rehearing, stating:

> The alleged "conflict" between the Trustee's duty to perform the APA and the Trustee's duty to address the CCB-Related Claims was . . . situational and inherent in the posture of the case. . . . [I]f these two overlapping events disqualified the Trustee and Counsel from representing the estate, anyone else seeking to be employed to represent the estate would be confronted with the same conflict.  Retaining special "independent counsel," as suggested by SMDI, would not have altered the status quo because special counsel would still be employed and directed by the Trustee.

Paige, No. 08-62, slip op. at 7–8.  We find the BAP's reasoning persuasive.

38

filing counterclaims within the Adversary Proceeding, and it chose not to do so. Paige, 2007 WL 4143212, at *8. Finally, SMDI suggests that "[t]he APA could have been modified." Conf. App., Aplt. Br. at 36 n.191. It does not explain how. Simply put, we see no effective solution the bankruptcy court could have implemented, short of barring ConsumerInfo outright from pursuing the CCB Claims or else taking over the role of the Trustee. SMDI offers no authority for either approach, and we are aware of none.

### iii. ConsumerInfo's Pre-Sale Order Conduct Does Not Demonstrate Bad Faith

SMDI also argues that ConsumerInfo's pre-APA conduct demonstrates that the Joint Plan was not proposed in good faith. According to SMDI, ConsumerInfo acted in bad faith to prevent Paige from filing a joint plan with SMDI. Then, SMDI argues, ConsumerInfo was able to obtain court approval of the APA because no plan had been proposed. According to SMDI, the APA, in turn, prevented SMDI from gaining confirmation of its own plan. Thus, SMDI argues that the bankruptcy court should have refused to confirm the Joint Plan on the basis that it was not proposed in good faith. Conf. App., Aplt. Br. at 45–46. We disagree.

The bankruptcy court made specific factual findings, in its memorandum decision confirming the Joint Plan, regarding the conduct of Paige and ConsumerInfo. The bankruptcy court "f[ound] any allegations of attempted bribery of Mr. Paige or subversion of a purported joint plan by the Debtor and SMDI unsubstantiated." Paige, 2007 WL 4143212, at *13. The court also acknowledged that it had been troubled by

39

ConsumerInfo's conduct, but said that "any concerns of the Court . . . have been addressed and allayed by the Joint Plan proponents in the evidence presented." Id. The court concluded that "Mr. Paige ignored the advice of his own attorney and kept his attorney in the dark regarding his contacts with ConsumerInfo." Id. Although the court thought "ConsumerInfo's attorneys should have known that . . . Mr. Paige was being represented by counsel, . . . engaging in these communications, albeit possibly improper under ethical rules, does not translate into filing of a plan by 'means forbidden by law' and not in 'good faith' eight months later." Id. In the court's view, the passage of eight months from the sale hearing to when the Joint Plan was filed "erodes and waters down much of the argument that SMDI has made." Id. at *14.

The bankruptcy court also determined that SMDI was not prejudiced by ConsumerInfo's conduct. Rather, SMDI's failure to file a plan prior to the sale hearing resulted primarily from SMDI's "mistaken belief that the Debtor had the exclusive right to file a plan after conversion of the case to one under Chapter 11. SMDI . . . was waiting on the Debtor to file a joint plan. SMDI has since acknowledged that this interpretation was incorrect." Id. at *12. Furthermore, "if SMDI was prejudiced between October 13 and December 7," the court determined that "it was because of Mr. Paige's conduct and not because of any wrongdoing by ConsumerInfo or its counsel." Id. These factual findings are not clearly erroneous.[8]

_____

[8] SMDI argues that the bankruptcy court only arrived at these conclusions because
(continued...)

40

The district court concluded that even if the bankruptcy court's interpretation of good faith under Pikes Peak was overly narrow, "SMDI's allegations of improper interference by ConsumerInfo are unpersuasive." Paige, 439 B.R. at 796. We agree. Even if ConsumerInfo's attorneys acted improperly in the period preceding the Sale Order, these actions did not prevent the SMDI Plan from receiving "an adequate and balanced appraisal." Paige, 584 F.3d at 1348. Considering the bankruptcy court's findings of fact, "the bankruptcy court did not err in finding that ConsumerInfo's conduct was not in bad faith."[9] Paige, 439 B.R. at 796.

---

[8](...continued)
it refused to consider some of SMDI's evidence. In particular, SMDI objects to the bankruptcy court's failure to consider transcriptions of voicemails Paige left for ConsumerInfo's attorneys and its refusal to allow SMDI to call ConsumerInfo's attorneys as witnesses. Conf. App., Aplt. Reply Br. at 15–16 (citing Conf. App., Aplt. App. at 2685–97). As we read them, however, the transcribed voicemails do not contradict the bankruptcy court's findings. We do not think the bankruptcy court abused its discretion in declining to make ConsumerInfo's attorneys testify about them, see Paige, 439 B.R. at 797 ("The excluded voice mails did not show any evidence of bribery and it is unclear what testimony from ConsumerInfo's counsel would have added."), or in excluding any of the other evidence to which SMDI points, Rinehart v. Sharp (In re Sharp), 361 B.R. 559, 565 (Bankr. W.D. Okla. 2007) ("When a trial court excludes evidence upon which the offering party properly objects, we will reverse only if the exclusion is an abuse of discretion that results in manifest injustice to the parties." (quotation omitted)).

[9] We do not reach ConsumerInfo's contention that SMDI's good faith arguments are barred because SMDI did not appeal the bankruptcy court's Sale Order. ConsumerInfo suggests somewhat vaguely that the Sale Order constitutes the law of the case, that the Sale Order "was res judicata on the parties and the court," and that SMDI's good faith arguments are an impermissible collateral attack on the Sale Order. Conf. App., Aplt. Br. at 40–41. Because we affirm the bankruptcy court's determination that the Joint Plan was proposed in good faith, we need not rule on these arguments.

41

**b. Fair and Equitable**

In addition to disputing whether the Joint Plan was proposed in good faith, SMDI raises substantive challenges to the Joint Plan's terms. The Joint Plan, SMDI argues, should not have been confirmed because it was not fair and equitable.

Section 1129(a)(8) requires that a plan be accepted by any class of claims or interests that is impaired. In § 1129(b), however, the Code provides an exception: if an impaired class does not accept the plan, the court "shall confirm the plan notwithstanding [§ 1129(a)(8)] if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class . . . that is impaired under, and has not accepted, the plan." § 1129(b)(1). The Code explains that "the condition that a plan be fair and equitable with respect to a class includes" the requirement that "[w]ith respect to a class of interests . . . the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property." §§ 1129(b)(2), 1129(b)(2)(C)(ii). This requirement, known as the absolute priority rule, "requires that certain classes of claimants be paid in full before any member of a subordinate class is paid." See Allen v. Geneva Steel Co. (In re Geneva Steel Co.), 281 F.3d 1173, 1180 n.4 (10th Cir. 2002). In this case, SMDI held the residual interest; there was no junior class of interests that could have received property. SMDI, therefore, does not dispute that the rule was satisfied. Conf. App., Aplt. Br. at 47. SMDI argues, however, that compliance with the absolute priority rule does not necessarily end the "fair and equitable" analysis.

The bankruptcy court concluded that the Joint Plan complied with § 1129(b)

42

because it "d[id] not discriminate unfairly in that all similar claims [we]re treated the same" and because the absolute priority rule was satisfied. Paige, 2007 WL 4143212, at *19. The district court concurred. Although it acknowledged that "some courts have found that the absolute priority rule does not end the 'fair and equitable' inquiry," it reasoned that "the Tenth Circuit has indicated that a plan can be 'fair and equitable' once the absolute priority rule is satisfied." Paige, 439 B.R. at 800 (citing Unruh v. Rushville State Bank, 987 F.2d 1506, 1507–08 (10th Cir. 1993)).

SMDI contends that the district court read Unruh and the statutory language too narrowly. Conf. App., Aplt. Br. at 47. There is some authority for SMDI's open-ended view of the fair and equitable requirement,[10] but we need not decide here whether to endorse it. Even if we did, none of the Joint Plan provisions SMDI points to would have precluded the plan's confirmation.

### i. Waiver of Election of Remedies

SMDI first argues that the Joint Plan was unfair because it included a provision expressly preventing the Liquidating Trustee from voluntarily accepting a monetary

---

[10] See, e.g., Bank of N.Y. Trust Co. v. Official Unsecured Creditors Comm. (In re Pacific Lumber), 584 F.3d 229, 245–46 (5th Cir. 2009) ("Even a plan compliant with the[] alternative minimum standards [of § 1129(b)(2)] is not necessarily fair and equitable."); In re Grandfather Mountain Ltd. P'ship, 207 B.R. 475, 487 (Bankr. M.D.N.C. 1996) ("[T]he plan must literally be fair and equitable. The determination . . . must be made on a case-by-case basis and depends upon the specific facts and circumstances of each case." (citation omitted)); 7-1129 Collier on Bankruptcy ¶ 1129.03[4][b][ii] (16th ed. 2012) ("[S]ome courts have incorrectly read the interplay of section 1129(b)(1) and section 1129(b)(2) to be an exhaustive delineation of the fair and equitable rule . . . .").

43

recovery in lieu of the Domain Name if he prevailed in the AP. According to SMDI, the estate had the right, under the APA, to take the value of the Domain Name instead of recovering the name itself. This right, SMDI argues, was worth millions of dollars.[11] Conf. App., Aplt. Br. at 48–49. In consideration for the estate abandoning this right, ConsumerInfo promised in the Joint Plan to fund the Adversary Proceeding, subordinate the CCB Claims, and pay up to $300,000 to resolve claims (other than the CCB Claims) against the estate. Id. at 49. SMDI argues that the consideration the estate received was inadequate.

This argument is flawed. We think the consideration ConsumerInfo provided was worth more and the right the estate waived was worth less than SMDI recognizes. While SMDI says ConsumerInfo failed to prove the value of subordination of the CCB Claims, the bankruptcy court estimated Claim 42-1 at $225,000, and nothing in the record suggests that Claim 27-2 was not worth its face value of over $130,000. SMDI also asserts that ConsumerInfo's promise to fund the AP "provided no value to the estate" simply because the Trustee agreed not to elect a monetary remedy in lieu of the Domain Name. Conf. App., Aplt. Br. at 49. To the contrary, even if the estate planned to turn

---

[11] SMDI reasons as follows: If the estate chose to accept the Domain Name, it had to turn it over to ConsumerInfo for no additional consideration. If, on the other hand, it accepted monetary compensation for SMDI's conversion of the name, it would keep 75% of that recovery under § 1.1(d) of the APA. See APA § 1.1(d) (providing that ConsumerInfo would "receive 25% of the Net Proceeds from Monetary Recoveries"). Thus, if the Domain Name was worth $5,000,000, the estate waived the right to elect a $3,750,000 recovery. Conf. App., Aplt. Br. at 48–49.

44

over to ConsumerInfo the primary fruit of the AP—the Domain Name—it also hoped to recover monetary damages (of which it would retain 75%). Thus, it still stood to gain from ConsumerInfo funding the AP.

More critically, however, SMDI overlooks the fact that the election of remedies waiver was worth very little if, as the bankruptcy court and district court both believed, the APA already required the estate to do its best to recover the Domain Name. In confirming the Joint Plan, the bankruptcy court concluded that the APA did not give the estate the option of accepting money instead of the Domain Name in the first place. Paige, 2007 WL 4143212, at *9 ("The court further finds that there is a reasonable basis for the Trustee to convey the Domain Name to ConsumerInfo, if recovered, because the Trustee is obligated to do so under the APA."). The bankruptcy court restated the same conclusion more explicitly two years later in its Adversary Proceeding decision. There, it concluded that the "APA required that . . . if the Trustee was successful in proving that the Domain Name was the property of the estate, or otherwise recovered the Domain Name, he would be required to deliver the Domain Name to ConsumerInfo. The . . . APA did not contemplate the delivery of value of the Domain Name in lieu of the Domain Name itself." Paige, 413 B.R. at 901. The district court agreed that the 75%-25% provision existed to allocate damages recovered in addition to the Domain Name. Paige, 443 B.R. at 891. To the extent it could do so in good faith, the Trustee had a duty to recover the Domain Name and turn it over to ConsumerInfo. If these courts were correct, then ConsumerInfo was not, as SMDI claims, buying a right worth $3,750,000. Rather,

45

ConsumerInfo was buying only peace of mind by gaining the estate's express abandonment of a right it probably did not even possess.

We need not decide whether the bankruptcy court and district court were right on this point or not. We only have to determine whether the chances of SMDI's interpretation prevailing were sufficiently doubtful that the estate's acceptance of less than 75% of the Domain Name's value was fair. We think that even if the courts' interpretation of the APA was not the only possible reading of that document, it was at least a reasonable one. Thus, the Joint Plan only deprived the estate of a right to elect remedies that likely did not exist. Even if an unfair compromise of claims could have made the Joint Plan unfair to SMDI's interest under § 1129(b), we reject SMDI's argument that the consideration the estate received was inadequate.

### ii. Deferment of Objections to CCB Claims

SMDI's second argument has to do with the Joint Plan's provision that objections to the CCB Claims "shall be deferred until there are Monetary Recoveries or other funds to pay them." Conf. App., Joint Plan ¶ 3.3. Such funds would become available, if at all, only after the conclusion of the AP.[12] SMDI, however, wished to object to the CCB Claims <u>before</u> the AP terminated. If, while the AP was pending, SMDI had been able to eliminate the CCB Claims or significantly lower their estimated value, SMDI argues that

---

[12] Such monetary recoveries, of course, would have been paid by SMDI. Ultimately, the bankruptcy court did not award any damages to the Liquidating Trust. The Trustee appealed the issue to the district court, which affirmed, and he did not appeal further.

it would have had sufficient funds to settle the AP by paying all claims against the estate. Conf. App., Aplt. Br. at 12–13, 15.  Once the AP was over, a successful objection to the CCB Claims could no longer permit SMDI to settle the AP and keep the Domain Name. SMDI argues, therefore, that deferment of objections to the CCB Claims was an inequitable term designed to inflict "special prejudice" on SMDI.  Conf. App., Aplt. Br. at 50 (quoting Grandfather Mountain Ltd. P'ship, 207 B.R. at 487).

Like the bankruptcy court, we are not blind to the parties' intentions in this litigation.  We have no doubt that the objection-delaying provision was of strategic value in ConsumerInfo's effort to see the AP litigated to its conclusion.  But SMDI simply does not provide any authority for the proposition that this provision inflicted the kind of "special prejudice" that could require denial of the Joint Plan's confirmation.  Any legitimate claims or interests SMDI had in this case were protected under the Joint Plan. SMDI's claims, like those of other creditors, were paid in full, with interest.  Moreover, the Joint Plan specified that if the Liquidating Trust were to recover funds that could benefit SMDI's interest, SMDI would have its chance to object to the CCB Claims (which would otherwise be paid first).  In its capacity as an interest-holder, SMDI had nothing to gain from objecting to the CCB Claims unless and until there was a monetary recovery in the AP.

To the extent that SMDI was prejudiced by the Joint Plan, the prejudice had nothing to do with its status as a creditor or interest-holder in the estate.  Of course, SMDI wanted a plan that would ensure settlement of the AP, while ConsumerInfo wanted a plan

47

that would make settlement less likely. But to the extent that SMDI had a right to try to maneuver the confirmation process toward a settlement that would let it keep property it obtained in violation of the automatic stay, this simply was not a right the Joint Plan was obligated to protect.

### iii. Bar on SMDI Objecting to Post-Confirmation Fees

Finally, the Joint Plan barred SMDI from objecting to the Liquidating Trustee's fees and provided that only the U.S. Trustee had standing to do so. SMDI argues that this restriction on fee objections was also a term of "special prejudice." Conf. App., Aplt. Br. at 50.

We cannot agree. ConsumerInfo and the Trustee had a legitimate reason for including this term. If they had not included it, SMDI could have continued to challenge the Liquidating Trustee's fees in order to impede his ability to litigate the AP against SMDI. We do not see how SMDI was unfairly prejudiced by its inability to do so.

### 4. Denial of Confirmation of the SMDI Plan

The bankruptcy court determined that the SMDI Plan was not confirmable because it was not feasible as required by § 1129(a)(11); it was not proposed in good faith under § 1129(a)(3); and it improperly classified ConsumerInfo's interests. The district court, after deciding to affirm the bankruptcy court's confirmation of the Joint Plan, declined to inquire into whether the SMDI Plan was also confirmable. Paige, 439 B.R. at 800. SMDI argues that both courts erred, and that we must determine whether its plan could

48

have been confirmed even if we agree that the Joint Plan was confirmable.[13]  Under §

1129(c), SMDI correctly notes, if more than one plan is confirmable, the bankruptcy court

must "consider the preferences of creditors and equity security holders in determining

which plan to confirm."  Conf. App., Aplt. Reply Br. at 21 n.57.  SMDI makes no effort

to explain why, if both plans were confirmable, a proper analysis under § 1129(c) would

have resulted in the SMDI Plan's confirmation.  But we need not speculate about whether

the bankruptcy court could have reached a different result if SMDI's plan was capable of

confirmation.  The bankruptcy court correctly concluded that it was not confirmable for

lack of feasibility.

A Chapter 11 plan cannot be confirmed unless it is feasible.  See § 1129(a)(11);

Pikes Peak, 779 F.2d at 1459 (noting that a plan must be feasible and practical to be

proposed in good faith).  "[T]he bankruptcy court has an obligation to scrutinize [a] plan

carefully to determine whether it offers a reasonable prospect of success and is

workable."  Pikes Peak, 779 F.2d at 1460.  "The test is whether the things which are to be

done after confirmation can be done as a practical matter under the facts" of the case.

---

[13] ConsumerInfo contends that the confirmability of SMDI's plan is moot because ConsumerInfo has acquired the Domain Name as a good faith purchaser pursuant to a sale order.  Under § 363(m), ConsumerInfo argues, we could not now deprive it of the Domain Name, which is what implementation of the SMDI Plan would require.  According to ConsumerInfo, "even if this Court concludes that SMDI's plan trustee could have conveyed the estate's interest in the Domain Name back in 2007, that is impossible today, and thus there is no way the SMDI Plan could presently be confirmed."  Conf. App., Aplee. Br. at 49.  For the reasons we explain below, § 363(m) does not render this issue moot.  See infra Part III.B.2.

Clarkson v. Cooke Sales & Serv. Co. (In re Clarkson), 767 F.2d 417, 420 (8th Cir. 1985) (quotation omitted). The bankruptcy court determined that the SMDI Plan was not feasible, and we review this finding of fact for clear error. Sherman v. Harbin (In re Harbin), 486 F.3d 510, 517 (9th Cir. 2007). We conclude that the bankruptcy court did not clearly err.

The SMDI Plan would have required the estate to settle the AP with SMDI and allow SMDI to keep the Domain Name. But in the bankruptcy court's view, the APA bound the Trustee to litigate the AP in good faith and, if possible, recover the Domain Name.[14] Paige, 2007 WL 4143212, at *20. Thus, the bankruptcy court concluded the SMDI Plan would cause the estate to breach its obligations to ConsumerInfo under the APA. The bankruptcy court determined that the SMDI Plan did not provide sufficient funds to resolve the claim ConsumerInfo threatened to bring for breach of contract. Moreover, if ConsumerInfo were to succeed in its claim against the estate, the bankruptcy court feared that the plan trustee would need to seek disgorgement from creditors who had already been paid. For all of these reasons, the court concluded that the SMDI Plan was not feasible. Id.

Not surprisingly, SMDI and ConsumerInfo have disagreed throughout this litigation about what the APA allowed. The APA, SMDI emphasizes, contemplated the

[14] The bankruptcy court's view that the SMDI Plan would have caused the Trustee to breach the APA was also the basis for the court's conclusion that the SMDI Plan was not proposed in good faith. See Paige, 2007 WL 4143212, at *14–17.

50

possibility of a settlement—it provided that the Trustee would reimburse ConsumerInfo with $1,825,000 of the $1.9 million purchase price in the event that the Trustee settled with SMDI. Conf. App., Aplt. Reply Br. at 24 (citing APA § 1.5). SMDI also notes that in approving the APA, the bankruptcy court itself said that the Trustee enjoyed the right "to determine strategy throughout the litigation," as well as "sole discretion to settle the adversary proceeding." Conf. App., Aplt. Br. at 9, 52 (quoting Paige, No. 05-34474, slip op. at 15). Therefore, SMDI reasons, the Trustee had the right at any time to drop the litigation and return the bulk of ConsumerInfo's money. The SMDI Plan proposed to do exactly that.

But the matter is not so simple. Numerous provisions of the APA limited the Trustee's power to settle, and the bankruptcy court read these provisions as requiring cause before he could do so. Specifically, the court cited:

> (1) paragraph 4.2 requiring the Trustee to take all steps necessary to proceed diligently and in good faith to satisfy each condition of the APA, (2) the portion in paragraph 1.5 requiring the Trustee to prosecute the AP in good faith, (3) paragraph 11.10 requiring each party to use reasonable, good faith efforts to do all things necessary to see that the conditions of the APA are satisfied, (4) paragraph 8.2(b) requiring the Trustee to transfer the Domain Name to ConsumerInfo at a subsequent closing without additional consideration, and (5) paragraph 8.4 requiring specific performance . . . .

Paige, 2007 WL 4143212, at *16. Moreover, the APA did not give the Trustee unfettered discretion to settle the AP, but rather conveyed the right to do so "in his reasonable business discretion." APA § 1.5.

The bankruptcy court reasoned, in light of these provisions, that "a dismissal by

51

the Trustee without showing any cause or excuse is not what was bargained for or allowed by the APA." Paige, 2007 WL 4143212, at *16. The Trustee had not determined that cause existed to settle—that "further pursuit of the claims in the AP [was] meritless or [that] the costs of proceeding [were] so excessive that the recovery would not justify the costs." Id. Thus, the court considered "dismissal under the SMDI Plan [to be] inconsistent with the APA." Id.

If the SMDI Plan were confirmed, then, the bankruptcy court believed ConsumerInfo would have a substantial claim for breach of contract against the estate. Id. at *20. Regardless of how this claim was resolved, the court thought that the cost of litigating it alone would be "very substantial." Id. The SMDI Plan allocated only $20,000 for the trustee's post-confirmation administration of the estate, an amount the bankruptcy court thought "would most likely be insufficient to contest [ConsumerInfo's] administrative claim." Id.

SMDI insists that the confirmability of its plan turns exclusively on "whether the settlement of the Adversary Proceeding, as proposed in the SMDI Plan, violated the APA." Conf. App., Aplt. Reply Br. at 22. If it did not, SMDI contends, "then there is no basis for any of the adverse findings on good faith, feasibility, or misclassification." Id. But this argument misses the point. The issue here is much like the "fair and equitable" analysis above. There, the question was not simply whether the estate had a right to elect remedies; even if a court might have eventually agreed that it did, the cause was sufficiently doubtful to justify the Trustee's course of action. Just so, the feasibility issue

52

is not—as SMDI contends—solely about whether the APA permitted a plan-imposed settlement of the AP. Rather, the question is whether the matter was murky enough that ConsumerInfo would have sued for breach of contract and quite possibly won.[15]

"To be feasible for purposes of section 1129(a)(11), a plan must take into account the possibility that a potential creditor may, following confirmation, recover a large judgment against the debtor." In re Harbin, 486 F.3d 510, 517 (9th Cir. 2007). The bankruptcy court recognized that a suit for breach was more or less inevitable, and it expected that ConsumerInfo would win. The court found that SMDI's plan did not "provide[] sufficient funding . . . for defense costs or to satisfy the monetary judgment that could result from the allowance of an administrative claim by ConsumerInfo." Paige, 2007 WL 4143212, at *20. We hold that these findings were not clearly erroneous. See Kane v. Johns-Manville Corp., 843 F.2d 636, 650 (2d Cir. 1988) (applying a clear error standard of review to the bankruptcy court's feasibility determination); Prudential Ins. Co. of Am. v. Monnier (In re Monnier Bros.), 755 F.2d 1336, 1341 (8th Cir. 1985) (same). Accordingly, we need not address the bankruptcy court's conclusions regarding

---

[15] In Paige, 584 F.3d at 1345–46, we said we were "unsure . . . that SMDI's plan would necessarily run afoul of the APA" and were therefore "not convinced that [ConsumerInfo] would necessarily have a viable breach-of-contract claim if SMDI's plan was ultimately confirmed." Of course, we also acknowledged that we had not fully evaluated the merits of the case at that juncture. Id. at 1348. But in any event, we need not be convinced even now that ConsumerInfo would win a suit for breach to recognize that SMDI provided insufficient funds to defend against it. Moreover, we note that while ConsumerInfo and the Trustee had the burden of proving SMDI's appeal was moot, id. at 1331, SMDI had the burden of proving compliance with the applicable provisions of § 1129.

53

good faith or proper classification of claims in the SMDI Plan.

### 5. Conclusion

In sum, we conclude that the Joint Plan was properly confirmed because it was proposed in good faith and was fair and equitable. We also hold that the bankruptcy court did not err in denying confirmation of the SMDI Plan for lack of feasibility.

## B. Adversary Appeal

### 1. Introduction

We turn now to the Adversary Appeal, in which SMDI argues that the bankruptcy court should not have made it give the Domain Name to the Liquidating Trust. The bankruptcy court carefully worked its way through the complicated history of the Domain Name's ownership and control and determined, as a factual matter, that "Paige personally owned and controlled [the Domain Name] prior to, as of, and through the Petition Date." Id. at 49. Accordingly, the Domain Name became property of the estate when Paige filed for bankruptcy. Paige's filing triggered an automatic stay under § 362 of the Bankruptcy Code, which prohibited "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate," absent court approval. § 362(a)(3). "Any action taken in violation of the stay is void and without effect." Franklin Sav. & Loan Ass'n v. Office of Thrift Supervision, 31 F.3d 1020, 1022 (10th Cir. 1994). The bankruptcy court therefore concluded that "all post-petition

54

transfers of the estate's rights in the Domain Name were void."[16]  Id.  The bankruptcy

court also held, in the alternative, that May had committed conversion under Utah law

when he obtained the Domain Name.  The bankruptcy court ordered SMDI to turn the

Domain Name over to the Liquidating Trustee pursuant to § 542(a), which requires

entities in possession of estate property that the trustee can sell to deliver it to the trustee.

In this appeal, SMDI does not challenge the bankruptcy court's factual

determination that the estate owned the Domain Name after Paige filed for bankruptcy.

Instead, SMDI makes two arguments that have to do with the Liquidating Trustee's

ability to recover the Domain Name under the Code, and two that are about the

applicability of a state law conversion claim in this case.  Under the Code, SMDI argues

first that neither the Liquidating Trustee nor ConsumerInfo had standing, as a

representative of the estate under § 1123(b)(3)(B), to enforce the bankruptcy estate's

claims for violation of the automatic stay or turnover of the Domain Name.  According to

SMDI, the Liquidating Trustee and ConsumerInfo could not serve as representatives of

the estate because a successful recovery on these claims benefitted only

ConsumerInfo—not the estate or its unsecured creditors, which had already been paid

pursuant to the APA and Joint Plan.  Second, SMDI contends that it could not be made to

turn the Domain Name over to the Liquidating Trust under § 542(a) in any event, because

---

[16] The court also determined that § 549, which deals with unauthorized post-petition transfers that were voluntarily initiated by the debtor, was inapplicable because Paige "neither authorized nor willingly transferred the Domain Name."  Id. at 53.

that provision does not allow a trustee to regain property "of inconsequential value or benefit to the estate." Again, SMDI argues that once the estate received all of the funds it was due under the APA and Joint Plan, the Domain Name could provide it with no further value or benefit.

SMDI's first argument under state law has to do with the nature of the Domain Name. SMDI argues that Utah law would not recognize a claim for conversion of intangible personal property. The bankruptcy court decided that the Domain Name was tangible property under Utah law, and SMDI challenges this determination. SMDI's second argument relating to conversion is that the cause of action is preempted by the Bankruptcy Code.

The district court rejected SMDI's Code-based arguments on the merits, but also concluded in the alternative that the case was moot. Before we can address SMDI's other arguments, we must explain why we disagree with the district court on this issue. Golfland Entm't Ctrs., Inc. v. Peak Inv., Inc. (In re BCD Corp.), 119 F.3d 852, 856 (10th Cir. 1997) ("We address the issue of mootness as a threshold question because in the absence of a live case or controversy, we have no subject-matter jurisdiction over an appeal.").

## 2. Mootness

Our mootness analysis centers on § 363(m) of the Code. That section provides that "[t]he reversal or modification on appeal of an authorization . . . of a sale . . . of property does not affect the validity of a sale . . . under such authorization to an entity that

56

purchased . . . such property in good faith . . . ." § 363(m).  An entity may purchase

property in good faith even if it knew an appeal of the sale authorization was pending.  Id.

Section 363(m) provides an exception only where "such authorization and such sale . . .

were stayed pending appeal."  Id.  SMDI sought a stay of the AP judgment, but did not

receive one.  ConsumerInfo argues that, as a result, we can order no effective relief and

SMDI's appeal is moot.  We are prevented from granting the relief SMDI seeks,

according to ConsumerInfo, because stripping ConsumerInfo of the Domain Name would

affect the validity of the underlying asset sale, which § 363(m) does not allow.

We are not convinced.  The Sale Order authorized the sale of the Domain Name

Assets "free and clear of claims, liens, interests and encumbrances" and provided that

ConsumerInfo would be "entitled to all of the protections of Section 363(m) of the

Bankruptcy Code."  Adv. App., Bankr. Ct. Sale Order of Dec. 12, 2006 at 3 ¶ 8.  But the

Sale Order provided a caveat: ConsumerInfo took the Domain Name Assets subject to

SMDI's defenses, "pending a ruling on such defenses in the Pending Adversary."  Id. at 2

¶ 6.[17]

---

[17] The Sale Order provided:

The Domain Name Assets are authorized to be sold, free and clear of claims, liens, interests and encumbrances pursuant to Sections 363(f) and 105 of the Bankruptcy Code, effective as of the date of the Subsequent Closing and pursuant to the Agreement.  The defendants in the Pending Adversary shall retain their defenses pending a ruling on such defenses in the Pending Adversary.

(continued...)

57

ConsumerInfo argues that SMDI lost the right to assert these defenses once the bankruptcy court ruled on them in its opinion of September 18, 2009. We disagree. The Sale Order authorized the sale of the Domain Name "as of the date of the Subsequent Closing and pursuant to the [APA]." Id. The APA specified that the Subsequent Closing was not to occur until after "a final and nonappealable order . . . determining that . . . the Estate owns the Domain Name and can transfer [it] to [ConsumerInfo] free and clear of all Interests." APA § 8.1. We conclude that this final and nonappealable order was the "ruling on such defenses" to which the Sale Order referred.

The APA did provide that ConsumerInfo could elect to accelerate the Subsequent Closing "so long as there is no stay pending appeal in effect at the time," id., and this is what ConsumerInfo did. But in choosing to move forward with the Subsequent Closing without the benefit of a final and nonappealable order, we believe that ConsumerInfo accepted the risk that SMDI could still prevail on the defenses it retained under the Sale Order. Section 363(m) does not strip SMDI of those defenses now. Although we ultimately reject SMDI's arguments on the merits, this case is not moot because § 363(m) would not bar us from providing the relief SMDI requests.

### 3. Standing to Prosecute the Adversary Proceeding

SMDI's first argument on the merits is that the Code did not permit the

---

[17](...continued)
Adv. App., Bankr. Ct. Sale Order of Dec. 12, 2006 at 2 ¶ 6.

Liquidating Trustee or ConsumerInfo to enforce the estate's statutory claims to the Domain Name. SMDI asks us to conclude, in essence, that the estate forfeited its ability to recover the Domain Name when it vested the Adversary Proceeding in a Liquidating Trust. The critical issue in this regard is whether the Liquidating Trustee was empowered to enforce the estate's § 542 turnover claim.

Section 542 provides a mechanism for a trustee to recover property belonging to the estate. The section provides, in relevant part, that "an entity . . . in possession, custody, or control . . . of property that the trustee may use, sell, or lease . . . shall deliver to the trustee, and account for, such property . . . unless such property is of inconsequential value or benefit to the estate." § 542(a). By its terms, § 542 requires turnover only to the trustee. Cf. In re Ice Cream Liquidation, Inc., 319 B.R. 324, 333 Bankr. D. Conn. 2005) ("[O]n its face, Section 542(b) inures to the benefit only of the 'trustee.'"). A separate provision, however, permits the enforcement of claims "belonging to the debtor or to the estate . . . by a representative of the estate appointed for such purpose" in a confirmed Chapter 11 plan. § 1123(b)(3)(A)–(B). We determine whether a party has standing to enforce estate claims under § 1123(b)(3)(B) using the two-part test laid out in Citicorp Acceptance Co. v. Robison (In re Sweetwater), 884 F.2d 1323, 1326 (10th Cir. 1989). First, we ask whether a confirmed plan expressly appointed the party to enforce the claims. Id. Second, we ask whether the appointed party qualifies as a representative of the estate. Id.

"The first element requires that the appointed party be approved by the court,

59

which can be accomplished simply by approval of [a] plan" that expressly authorizes the party to prosecute claims post confirmation. Retail Mktg. Co. v. King (In re Mako), 985 F.2d 1052, 1054 (10th Cir. 1993). SMDI does not dispute that the Liquidating Trustee was properly appointed by the Joint Plan to litigate the estate's claims in the AP. See Paige, 413 B.R. at 904–05.[18]

In evaluating the second element—whether a party represents the estate—our "primary concern is whether a successful recovery by the appointed representative would benefit the debtor's estate and particularly, the debtor's unsecured creditors." Sweetwater, 884 F.2d at 1327 (quotation omitted). Benefit to the unsecured creditors need not be direct, and we interpret the requirement broadly. See, e.g., id. ("[T]o the extent these avoidance actions have been used to satisfy the administrative claimants, who have priority over other unsecured creditors, the estate has more funds available to pay other unsecured creditors."); Churchfield Mgmt., 122 B.R. at 82 ("Courts have broadly interpreted the requirement of benefit under § 1123(b)(3)(B)."); cf. Gonzalez v. Conagra Grocery Prods. Co (In re Furr's Supermkts., Inc.), 373 B.R. 691, 699 (B.A.P. 10th Cir. 2007) (citing Sweetwater for the proposition that "benefit of the estate" under § 550(a) is interpreted broadly). SMDI's contention is that the Liquidating Trustee was not

---

[18] SMDI does argue that ConsumerInfo lacked separate standing to litigate the AP because it was never appointed to do so. Id. at 905. The bankruptcy court concluded that ConsumerInfo had standing to litigate the AP independent of § 1123(b)(3)(B), because of the co-interest it had purchased in the APA. Id. We do not reach this issue because we hold that the Liquidating Trustee, at least, had standing.

60

the estate's representative because the Joint Plan required him to turn over the fruits of a successful § 542 recovery—the Domain Name—to ConsumerInfo alone. Thus, SMDI argues, the recovery of the Domain Name offered no potential benefit to the estate's unsecured creditors in general. Although we acknowledge that the issue is a close one, we conclude that SMDI's view relies on an unduly narrow reading of § 1123(b)(3)(B) and our opinions interpreting that provision.

As an initial matter, we note that the Liquidating Trustee clearly had standing to maintain the estate's claim for violation of the automatic stay under § 362. The Liquidating Trustee sought actual and punitive damages under § 362(k), see Paige, 413 B.R. at 920, and as the bankruptcy court observed, "to the extent there were any monetary recoveries from the Adversary Proceeding, these would be shared between the parties with 25% going to ConsumerInfo and the balance going to the estate to pay existing and future estate obligations," id. at 906. This 75% share would have benefitted the estate had the bankruptcy court awarded damages, Sweetwater, 884 F.2d at 1327, and it is irrelevant that the bankruptcy court ultimately did not do so. As the district court noted, "[b]ankruptcy law cannot be that post-confirmation standing is conditioned upon the success of the claims being litigated." Paige, 443 B.R. at 895.

We do, however, agree with SMDI that standing to establish a violation of the automatic stay under § 362 does not necessarily equate to standing to press a separate claim to recover property under § 542. See Adv. App., Aplt. Reply Br. at 17–18. Nonetheless, we conclude that the Liquidating Trustee had standing to obtain turnover of

61

the Domain Name because his prosecution of the turnover claim was ultimately for the benefit of the estate's unsecured creditors.

"The key question here . . . is whether the benefit envisioned by § 1123(b)(3)(B) encompasses the past benefits to the estate which were achieved through the [APA and Joint Plan]." Winston & Strawn v. Kelly (In re Churchfield Mgmt. & Inv. Corp.), 122 B.R. 76, 82 (Bankr. N.D. Ill. 1990). The bankruptcy court answered this question in the affirmative. "In arguing that the prosecution of the Adversary Proceeding provides no benefit to the estate," the court reasoned, "SMDI . . . ignore[s] the substantial consideration that the estate received from ConsumerInfo under the Sale Order and the Joint Plan." Paige, 413 B.R. at 906.

> ConsumerInfo has already paid the estate well over $2 million and subordinated its CCB related claims so that all other creditors of the estate could be paid in full with interest, including SMDI . . . . It gave this in consideration for the legally binding commitments made to it under the ConsumerInfo APA and the Joint Plan, which required the prosecution of this Adversary Proceeding and the conveyance of the Domain Name to ConsumerInfo if the Trustee prevailed at trial . . . . Without ConsumerInfo's infusion of cash, the creditors of the Paige estate would have received little if anything on account of their claims.

> These transactions clearly benefitted the estate because they allowed the Trustee to pay all of the creditors (except for certain disputed claims) in full . . . . The Court believes that in determining post-confirmation standing, it is appropriate to consider not only future benefits but also past benefits to the estate and the creditors.

Id. at 906–07.

We agree with the bankruptcy court. SMDI's counsel acknowledged at oral argument that it would have been "entirely appropriate" if the Trustee had litigated the

62

Adversary Proceeding to completion, obtained the Domain Name, and then auctioned it off to the highest bidder and distributed the proceeds to unsecured creditors.[19] Adv. App., Oral Argument at 8:27–8:51. The Trustee's ability to do so, however, was jeopardized by the costliness and complexity of the litigation and the estate's lack of resources. Early on, the Trustee recognized that he could best serve the estate's creditors by selling the estate's interests in the Domain Name; he then did so with the bankruptcy court's approval. The prospect of a successful recovery on the estate's § 542(a) claim thus translated into a direct and immediate benefit for the unsecured creditors. To ignore this benefit would be to elevate form over substance. We do not think Congress intended to punish a party in ConsumerInfo's position with a forfeiture for having provided consideration in a manner that made it more likely that "the plan w[ould] achieve its intended results which are consistent with the purposes of the Bankruptcy Code." Pikes Peak, 779 F.2d at 1459; see Gonzales v. Nabisco Div. of Kraft Foods, Inc. (In re Furrs), 294 B.R. 763, 781 (Bankr. D.N.M. 2003) ("[I]t should not make a difference whether the assignee pays the consideration before or after the collections; indeed, from the estate's point of view, it is even more beneficial for the assignee to make the payments beforehand (and presumably earlier) rather than afterward, and for the payments to be mandatory rather than contingent."). Rather, we are convinced by the approach adopted by the Seventh Circuit

---

[19] Similarly, if the Joint Plan had conditioned a portion of ConsumerInfo's obligation to pay on its actual receipt of the Domain Name, SMDI could hardly have questioned that a turnover order would lead to a benefit for the estate.

with regard to the analogous search for benefit to the estate under § 550(a).[19]  In Mellon

Bank, N.A. v. Dick Corp., 351 F.3d 290 (7th Cir. 2003), the court reasoned as follows:

> Having put the prospect of preference recoveries to work for the benefit of all
> creditors (including the unsecured creditors) ex ante . . . —in the process
> facilitating a swift sale that was beneficial all around—the bankruptcy judge
> did not need to use them ex post a second time, for still another benefit to the
> estate; there was no further benefit to be had.

Id. at 292; see also Official Comm. of Unsecured Creditors of Maxwell Newspapers, Inc.

v. MacMillan, Inc. (In re Maxwell Newspapers, Inc.), 189 B.R. 282, 287 (Bankr.

S.D.N.Y. 1995) ("This is not to say that unsecured creditors must benefit from a favorable

result in the avoidance action; the benefit may come from the transfer of the claim itself

through, for example, settlement yielding a benefit to the unsecured creditors.").

SMDI argues, however, that this result is foreclosed by our decision in Mako.

Adv. App., Aplt. Br. at 26–27.  In that case, the bankruptcy court confirmed a Chapter 11

plan under which Retail Marketing Company (RMC) purchased the debtor corporation's

assets.  Mako, 985 F.2d at 1054.  After confirmation, RMC commenced new litigation in

an effort to enforce avoidance claims of the estate.  Id. at 1054.  The confirmed plan

appointed RMC to assume the debtor's rights in pending adversary proceedings, but we

concluded that "the provision of the plan purporting to confer authority on RMC to

initiate avoidance actions after confirmation of the plan [was] vague."  Id. at 1055.

---

[19] Section 550(a) provides that when a transfer is avoided under §§ 544, 545, 547, 548, 549, 553(b), or 724(a), "the trustee may recover, for the benefit of the estate, the property transferred, or . . . the value of such property."

64

Indeed, we noted, a separate Litigation Trustee had actually been appointed under the plan to "act on behalf of all unsecured creditors." Id. Accordingly, we held that RMC had not been appointed to exercise the avoidance powers at issue, as required by the first prong of the Sweetwater test. Id.

We also noted that a "presumption against reservation of avoidance powers without clear evidence is consistent with the second element of the Sweetwater test—that the party appointed under § 1123 represent the estate." Id. at 1056. We explained:

> The fundamental principle underlying this [second] requirement is that "post-petition avoidance actions should be pursued in a manner that will satisfy the basic bankruptcy purpose of treating all similarly situated creditors alike; one or more similarly situated creditors should not be able to pursue an avoidance action for their exclusive benefit." The requirement that retention of the avoidance powers be clear serves to protect the unsecured creditors and to ensure that post-confirmation avoidance proceedings are for their benefit.

Id. (citation omitted). We noted that RMC was not obligated to distribute any part of a recovery from its avoidance actions to the unsecured creditors of the estate, and that "[a] successful recovery . . . [would] work only to the benefit of RMC." Id. Under these circumstances, RMC lacked authority to initiate new avoidance actions.

We conclude that Mako is distinguishable from the present case for a number of reasons. First, while RMC paid for whatever rights it received under the confirmed plan in Mako, we concluded that the right to initiate avoidance actions was not one that it purchased. Mako, 985 F.2d at 1055. This means that RMC never provided even a past benefit to the estate in exchange for the powers it sought to assert. Here, by contrast, the benefits the estate received in exchange for the Domain Name are undeniable. As we

65

have explained, the pre-confirmation Trustee could have litigated the estate's claims under §§ 362 and 542, obtained the Domain Name, and sold it for the benefit of the estate. But instead, the Trustee used the claims to obtain a benefit for the estate sooner.

This case is further distinguishable from Mako in that the Liquidating Trustee here was pressing multiple interrelated claims, at least one of which—the claim for violation of the automatic stay—sought a prospective monetary benefit to the estate. Cf. id. at 1056 ("[T]he uncontested finding of the bankruptcy court was that under the plan RMC is not obligated in any way to distribute any proceeds realized from the successful prosecution of this avoidance action to the unsecured creditors of the estate." (quotation omitted)). SMDI itself points out that "§ 362 is not remedially separate from the turnover claim under § 542." Adv. App., Aplt. Reply Br. at 13. The bankruptcy court concluded that any post-petition transfers violated the automatic stay and were thus void ab initio. The Domain Name was, as a result, the property of the estate at all relevant times. The bankruptcy court properly recognized that it was property that was of consequential value to the estate, Paige, 413 B.R. at 919, and it was also plainly property that the trustee could sell, as evidenced by the Sale Order, see Sale Order ¶ 6 ("The Domain Name Assets are authorized to be sold . . . pursuant to Sections 363(f) and 105 of the Bankruptcy Code . . . ."). Accordingly, it was subject to turnover. See § 542(a) (requiring turnover of property of consequential value to the estate that the trustee may sell under § 363).

As we explained above, a successful recovery under § 362 could have led to a further distribution of funds to the estate's unsecured creditors. But ConsumerInfo, of

66

course, was only willing to finance the post-confirmation prosecution of the § 362 claim because the Liquidating Trustee also sought recovery of the Domain Name under § 542. Thus, an anticipated successful recovery under § 542 not only benefitted the unsecured creditors who were paid in full under the Joint Plan, it was also an integral part of an Adversary Proceeding which was intended to obtain additional, prospective recoveries for the benefit of the estate.

Finally, and fundamentally, in both Sweetwater and Mako we were guided by the principle that "'one or more similarly situated creditors should not be able to pursue an avoidance action for their exclusive benefit.'" Mako, 985 F.2d at 1056 (quoting Sweetwater, 884 F.2d at 1328). Section 1123(b)(3)(B), we held, does not allow a plan to assign estate claims to parties who "merely represent [their] own interests." Sweetwater, 884 F.2d at 1327. In this case, unlike in Mako, the Adversary Proceeding was initiated by a Chapter 11 Trustee for the benefit of the estate's unsecured creditors. The Liquidating Trustee appointed to exercise the "rights and powers of the Chapter 11 Trustee," Joint Plan § 5.2, did not "merely represent his own interests," Sweetwater, 884 F.2d at 1327. Rather, he was a representative tasked with carrying out the terms of a confirmed Chapter 11 plan which had made possible the prompt payment of unsecured creditors' claims. Although ConsumerInfo ultimately received the Domain Name, the avoidance action was not for ConsumerInfo's exclusive benefit; the money gained through the action inured to the benefit of the unsecured creditors, who were paid back with interest. In sum, we conclude that the vesting of the Adversary Proceeding in the Liquidating Trust did not

67

excuse SMDI from its duty to turn over the Domain Name.  The bankruptcy court properly ordered turnover.

Having concluded that turnover was appropriate, we also reject SMDI's argument that it could only be required to turn over the value of the Domain Name at the time of Paige's bankruptcy, and not the actual Domain Name.  SMDI's contention is that Paige never owned the Domain Name itself, but instead possessed only a contractual right to use the Domain Name for a specified period.  Adv. App., Aplt. Br. at 34.  Paige's Service Agreement with Network Solutions was to last only from May 2003 until May 2006.  If "Paige's (and the estate's) rights to use the Domain Name expired eight months after Paige filed bankruptcy in September 2005," SMDI argues that it could not be made to turn over the Domain Name itself.  Id.  Rather, SMDI says, "the only remedy for turnover . . . the bankruptcy court could have properly ordered . . . was the value of the estate's contractual rights as they existed at the time of bankruptcy."  Id.  Even if we assume SMDI is right about the nature of Paige's property rights in the Domain Name, SMDI cannot dispute that the Domain Name was, in fact, still registered with a domain name registrar when the bankruptcy court entered its judgment in the AP.  See, e.g., Conf. App., Aplt. Br. at 54 (asking this court to "require ConsumerInfo to transfer the registration of the Domain Name back to SMDI"); Adv. App., Aplee. Br. at 5 n.3 (representing that "[a]fter the Judgment was entered, the Domain Name registrar recognized the Trustee's title and honored his instruction to change registration of the Domain Name to ConsumerInfo").  Someone, apparently, renewed the Service Agreement.  If that person

68

was not Paige or the Trustee, it was only because SMDI was exercising control over the Domain Name in violation of the automatic stay. SMDI asks this court to reward it with the Domain Name for having done so. We decline this invitation.

After it had concluded that the estate was entitled to the Domain Name under §§ 362 and 542, the bankruptcy court ruled, in the alternative, that SMDI had converted the Domain Name. Paige, 413 B.R. at 920. Because we uphold the bankruptcy court's judgment for the reasons set forth above, we see no reason to address the parties' arguments regarding this alternative rationale.

### 4. Conclusion

In conclusion, we hold that the issues SMDI raises in the Adversary Appeal are not moot. Nonetheless, we reject SMDI's argument that the Trustee lacked standing to prosecute the AP and obtain turnover of the Domain Name. Accordingly, we do not reach SMDI's arguments as to whether a conversion theory was viable in this case.

### C. Fee Appeal

In the Fee Appeal, we are asked to review the BAP's ruling that SMDI lacks standing to object to the Trustee's fees because SMDI would be unlikely to benefit if the Trustee were required to disgorge fees. Because we have determined that the Trustee was disinterested, there is no longer any basis for SMDI's fee challenge. SMDI's appeal of the BAP's ruling that SMDI lacked standing to bring the challenge is therefore moot. See Alabama v. North Carolina, 130 S. Ct. 2295, 2307 (2010); Boucher v. Shaw, 572 F.3d 1087, 1090 (9th Cir. 2009) (issue of a party's standing became moot after its claim was

69

resolved against it on the merits); <u>Minn. Pub. Interest Research Grp. v. Selective Serv. Sys.</u>, 747 F.2d 1204, 1205 (8th Cir. 1984) (per curiam).

## IV. CONCLUSION

Although we REVERSE the district court's mootness ruling in the Adversary Appeal, in all other regards we AFFIRM the district court's decisions upholding the bankruptcy court's judgments in the Confirmation Appeal and Adversary Appeal. We DISMISS the Fee Appeal as moot.